Raj V. Abhyanker, California SBN 233284
raj@legalforcelaw.com


LEGALFORCE RAPC WORLDWIDE, P.C.
1580 W. El Camino Real, Suite 10
Mountain View, CA 94040
Telephone:     (650) 965-8731
Facsimile:     (650) 989-2131

Attorney for Plaintiff,
LegalForce RAPC Worldwide P.C.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LEGALFORCE RAPC WORLDWIDE, P.C.<br><br>Plaintiff,<br><br>v.<br><br>MH SUB I, LLC., a Delaware corporation,<br><br>Defendant. | Case No. : 3:24-cv-00669-WHA<br><br>**SUPPLEMENTAL BRIEF: PROTECTING SMALL-BUSINESS MARKS IN ALGORITHMIC SEARCH ENVIRONMENTS**<br><br>Trial Date:    Oct. 29, 2025<br>Time:          7:30 am<br>Dept.:         Courtroom 12, 19th Floor<br>Judge:         Honorable William H. Alsup |

0

## I. __INTRODUCTION__

1. This supplemental brief is submitted on behalf of the Plaintiff in this case to aid the Court in answering its fundamental question: **"How can browsers be used to simultaneously show infringing trademarks, and what logomark confusion can exist post-arrival onto a junior mark's website?"** Plaintiff LegalForce RAPC Worldwide, P.C., the senior mark owner, submits that both forms of confusion; simultaneous confusion in browser-based search results and post-visit goodwill confusion after a consumer reaches a junior user's site, are actionable under established Ninth Circuit precedent.

2. In today's digital marketplace, consumers primarily encounter professional service brands through AI-driven search engines, voice assistants, and chatbots that curate results algorithmically. These systems often display competing businesses together or substitute one for another, creating confusion at the very moment a user seeks a specific brand. Once the consumer clicks through, the confusion may persist or evolve--especially when similar logomarks, website layouts, or interlinked domains are involved. The evidence here, including deposition testimony describing "scheme-y" cross-linking between LawFirms.com and Nolo to pass Google PageRank, demonstrates how such tactics misappropriate the goodwill of a smaller firm like LegalForce by diverting users through deceptive SEO and networked site architecture.

3. Traditional trademark confusion frameworks - particularly the *Eveready* and *Squirt* survey models fail to capture these dynamics. Designed for an analog marketplace, they cannot account for algorithmic decision-making, AI summarization, or personalized search results that mediate nearly every modern consumer interaction. The result is a systemic blind spot that disadvantages small-mark owners whose customers are diverted before meaningful engagement ever occurs. Accordingly, this brief urges the Court to recognize that trademark confusion in the AI era extends beyond initial click-through to encompass post-visit goodwill confusion--where a consumer's mistaken belief in affiliation, once triggered by misleading browser results, continues even after arrival on the junior user's site. Protecting small and mid-sized businesses from this evolving form of digital misappropriation is necessary to preserve the Lanham Act's core purpose: preventing consumer deception and safeguarding the reputation and goodwill of

**Brief #1 :** Supplemental Brief: Rethinking Trademark Confusion Tests in the AI Era
Case No.:3:24-cv-00669-WHA

legitimate mark holders in an AI-driven search environment.

## II.  CAUSES OF ACTION AND "INITIAL INTEREST" CONFUSION

4. The Lanham Act prohibits the unauthorized use of a registered mark in commerce when such use is *"likely to cause confusion, or to cause mistake, or to deceive"* 15 U.S.C. 1114(1)(a), 1125(a)(1). In practice, this requires the senior mark owner to prove a likelihood that consumers will be confused about the source, sponsorship, or affiliation of the parties' services.

5. Similarly, False Designation of Origin and False Advertising (§1125(a)) reach uses of words or symbols in advertising that mislead consumers as to origin, affiliation, or the characteristics of goods/services. For example, §1125(a)(1)(A) forbids any misleading representation suggesting an affiliation or endorsement that does not exist, and §1125(a)(1)(B) prohibits advertising misrepresentations about the nature or origin of goods.

6. Finally, Common-Law Trademark Infringement (California) parallels the federal standard: a senior user with priority can enforce its mark based on prior use, even without registration, by showing the junior's use creates a likelihood of confusion and misappropriates the senior user's goodwill. In all these claims, the *central issue* is whether consumers were likely to be confused or deceived by the junior user's actions during the relevant time period (in this case, approximately November 2023 and July 2024, where AI powered search and chatbot recommendation had already started being widely adopted).

7. In trademark law, consumer confusion need not occur at the point of sale; even initial confusion that lures a customer's interest can be actionable. The Ninth Circuit and other courts recognize that a junior user's conduct which attracts consumers' attention by using the senior mark (even if those consumers realize the truth before completing a purchase) may violate the Lanham Act.  *Brookfield Communications, Inc. v. West Coast Entertainment Corp*., 174 F.3d 1036 (9th Cir. 1999). This is known as initial interest confusion. For example, in *Brookfield*, West Coast's use of the term "MovieBuff" (Brookfield's mark) in its website meta-tags caused search engines to direct consumers to West Coast's site.

8. Many web surfers searching for Brookfield's "MovieBuff" products were diverted to

1    West Coast's website and, finding similar offerings there, some decided to use West Coast's

2    services instead. The court noted that although those consumers would eventually realize West

3    Coast was a different company, "there is nevertheless initial interest confusion" – West Coast

4    improperly benefitted from the goodwill associated with Brookfield's mark by capturing the

5    consumer's initial attention under false pretenses. *Id.* The Ninth Circuit explicitly held that

6    using another's mark to "capture initial consumer attention, even though no actual sale is finally

7    completed," is actionable trademark infringement. In short, initial interest confusion occurs

8    when a junior user is used to "lure" consumers by creating a mistaken initial impression of

9    affiliation, gaining an unfair competitive advantage. This doctrine has been applied to scenarios

10   like misleading meta-tags, search keywords, or look-alike product listings and it squarely

11   implicates the testimony by deposition today the "scheme-y way of passing Google page rank

12   from one site"  (read into evidence by the Plaintiff's counsel today based on the Deposition

13   Transcript of James Duffy Keating, Oct. 17, 2024, lines 25, page 28 to line 3, page 29), where

14   customers first encounter the senior business online.

15       9. The way consumers find and engage with businesses online has shifted dramatically in

16   recent years. Increasingly, users rely on AI-powered recommendation systems – e.g. search

17   engines enhanced by generative AI (such as Google primary search engine Google.com now has

18   Google AI summaries, called AI Overviews, which provide AI-generated overviews at the top

19   of search results to offer quick, conversational answers by synthesizing information from

20   multiple sources)[1] , voice assistants, and chatbot platforms (ChatGPT, Claude, etc.) -  rather

21   than manually sifting through pages of search results. These AI systems often deliver a single

22   curated answer or a personalized set of recommendations, interjecting themselves as

23   intermediaries between consumers and brands.[2]

24       10.      Studies indicate that a significant portion of consumers (over one-third) use AI

25

26   [1] About ads and AI Overviews," Google Ads Help Center, accessed October 28, 2025,
     https://support.google.com/google-ads/answer/16297775?hl=en

27   [2] Bharti, Sneha, "Trademark Law in the AI Era: Adapting to a Changing Consumer Landscape,"
     *IP & Legal Filings (IPLF)*, April 26, 2025,

28   https://www.ipandlegalfilings.com/trademark-law-in-the-ai-era-adapting-to-a-changing-consumer-landscape/

1  assistants to personalize their shopping and get guidance on purchases, relying on AI

2  suggestions more than traditional search listings.[3]  Legal commenters have observed that "[w]e

3  all know that TM law focuses on the confusion caused to the consumers as a deciding factor for

4  TM infringement allegations, but it is to be noted that AI is an undeniable aspect of consumer

5  confusion, especially at the initial stage when a layman consumer searches to look out for

6  brands and then makes the decision for purchase based on the search results generated by AI."[4]

7      11.    In effect, AI algorithms have become "gatekeepers" of information, capable of

8  steering consumers' initial attention toward particular products or companies.[5]  This raises a

9  critical question for trademark law: *how do we assess likelihood of confusion when an AI, which*

10  *itself cannot be "confused" in the human sense, presents or even selects the options the*

11  *consumer sees?*  Id.

12     12.    In a generalized hypothetical and in the facts in thai case, the senior mark's business

13  is discovered by customers through these very channels. For instance, a potential customer

14  might ask a voice assistant or chatbot for a recommendation ("Find me lawyer for

15  [trademarks]") and be presented with the junior user's business ("LawFirms.com") instead, or

16  alongside the senior mark ("LegalForce"). The opportunity for initial interest confusion is high:

17  an uninformed consumer could easily assume the recommended result is affiliated with or an

18

19  [3] AI deployment in consumer goods & retail – worldwide: use cases," *Statista*,
https://www.statista.com/statistics/1197958/ai-use-cases-consumer-goods-retail-global/

20  (accessed Oct. 28, 2025), AI use cases in consumer goods and retail industry worldwide as of
2020) shows that 36% percent of consumers use AI for personalization of goods and services

21  and get better guidance while purchasing with AI as opposed to without AI assistance.  It is
imperative to consider that with the recent advancements, AI, more than simply suggesting

22  different brands to the consumers is now capable of influencing their decision.

23  [4] Arora, Aditi. "*Initial Interest Confusion, AI and IPR Protection*." The IP Law Post, 30 July

24  2022. Accessed 28 Oct. 2025.
https://iplawpost.wordpress.com/2022/07/30/initial-interest-confusion-ai-and-ipr-protection

25  [5] *Id.* : "AI can be termed as a gate-keeper between the consumers and the brands which can act

26  as a semi-permeable agent, controlling the passage of information at its discretion. Thus, the AI
interface is a filter for a wide range of products worldwide and has considerable control over

27  consumers' choices. If we search for a particular desired brand per se and the interface suggests
certain similar brands in the search results, an uninformed customer is likely to believe in some

28  association between the two brands or at least take advantage of their competitor's brand value
at the initial stage of choosing."

**Brief #1 :**  Supplemental Brief: Rethinking Trademark Confusion Tests in the AI Era
Case No.:3:24-cv-00669-WHA

update of the business they named, or simply be diverted to the junior's offering without realizing the mix-up. Importantly, the AI-mediated context amplifies the consequences of initial confusion. A consumer misdirected to the junior's website ("LawFirms.com") may immediately be targeted through cookies and remarketing, meaning even if they discover the mistake, the junior user's advertisements and suggestions will persistently follow them online, continuously capitalizing on that initial diversion. In short, AI-driven search results and targeted marketing can turn a momentary initial confusion into a lasting redirection of consumer attention and loyalty.

### III.  INADEQUACY OF TRADITIONAL CONFUSION TESTS IN AN AI ECONOMY

13.    Trademark law traditionally relies on certain methodologies to gauge likelihood of confusion, including consumer surveys and multi-factor analyses. Two well-known survey formats - the *Eveready* test (*Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976)) and the *Squirt* test (*SquirtCo v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980)) have become staples in trademark litigation to measure consumer confusion.[6] However, we respectfully submit that both *Eveready* and *Squirt* surveys are woefully inadequate in the context of modern internet and AI-driven commerce. These tests were conceived decades ago (in 1976 and 1980, respectively) – *long before the personal computer, the web, or artificial intelligence assistants redefined how consumers encounter brands*. As discussed below, each test has critical shortcomings when applied to our scenario, where *Sleekcraft* factors support a smaller senior brand (LegalForce), but there is ambiguity on appropriate tests for "initial interest" diversion online. The result is that current survey evidence methodologies fail to capture the reality of consumer confusion in the age of algorithmic recommendations.

**The Eveready Test – Antiquated Assumptions for Famous Marks**

14.    The *Eveready* survey (from *Union Carbide Corp. v. Ever-Ready, Inc.*, 7th Cir. 1976)

---

[6] Polsky, Gregg D., & Cauble, Emily. "The Problem of Abusive Related-Partner Allocations," *Georgia Law Review* Vol. 16 (2014). Available at:
https://digitalcommons.law.uga.edu/fac_artchop/1086

is a classic *"unaided recall"* approach. Survey respondents are shown only the junior (defendant's) product or mark - with no mention of the senior mark at all - and are asked essentially "Who do you think puts out the product shown here?" as explained by the Defendant's expert David Neal in this case. In the original *Eveready* case, for example, participants were shown a light bulb labeled "Ever-Ready" (the junior mark) and asked that question; only if consumers on their own link the junior product to the senior company (Union Carbide's "Eveready" batteries) is confusion recorded.[7] This format by design "assumes" respondents have prior awareness of the senior mark, as noted by leading authorities. *Id.* *Eveready* survey sparks much debate when it comes to its applicability, specifically with regards to the importance of fame of the senior (i.e., preceding) mark. (Or junior mark, in cases of reverse confusion.) In *McCarthy on Trademarks and Unfair Competition*, J. Thomas McCarthy notes that the *Eveready* survey "assumes" its respondents have prior awareness of the senior mark, and that it is "especially appropriate" in cases involving widely known marks.[8]

15.    Similarly, in "*Trademark and Deceptive Advertising Surveys*," Jerre B. Swann and Shari Seidman Diamond write that the *Eveready* survey is "the gold standard," specifically when the tested mark or product is "top of mind, i.e., highly accessible. [9] It has even been called the "gold standard" for consumer confusion surveys *but only when the senior mark is highly famous or "top-of-mind" to consumers*. *Id*. In other words, the *Eveready* test works best for widely recognized brands (e.g. Kodak, Coca-Cola), where many consumers, when shown a similar mark, will immediately think of the famous brand.

16.    The corollary is that *Eveready* utterly breaks down when the senior mark is not well-known. If the senior service brand is relatively small or niche, an *Eveready* survey will likely show a low confusion percentage - not because consumers truly aren't confused in the real world, but because many consumers in the survey simply don't recognize the senior name

---

[7] *Union Carbide Corp. v. Ever-Ready Inc*., 392 F. Supp. 280 (N.D. Ill. 1975),
https://law.justia.com/cases/federal/district-courts/FSupp/392/280/1580267/
[8] *McCarthy, J.T., McCarthy on Trademarks and Unfair Competition*, 4th Ed.
[9] *Trademarks and Deceptive Advertising: Surveys*, eds. Swann, J.B., and Diamond, S., ABA, 2012, p. 53.

**Brief #1 :** Supplemental Brief: Rethinking Trademark Confusion Tests in the AI Era
Case No.:3:24-cv-00669-WHA

1    at all and thus fail to make any connection when viewing the junior mark.   That is what is

2    happening in this case, and for this reason, the opinion of Dr. David Neal in this case on behalf

3    of Defendant is irrelevant.

4        17.    In our case, the senior mark is a professional services business (LegalForce) that,

5    while established, is not a household name nationwide. An *Eveready*-style survey would, does,

6    and did undercount confusion by ignoring the scenario where a consumer *would* be confused if

7    they knew of the senior mark, but they don't spontaneously recall it. Courts have noted this

8    inherent bias: *Eveready* surveys assume consumer familiarity and thus tend to under-report

9    confusion for less famous marks.[10] Tellingly, when a small business plaintiff (LegalForce) with

10   a use-in-interstate commerce mark in a small narrow niche faces a low or zero *Eveready* survey

11   result, it is not uncommon to argue (as Plaintiff does here) that any conventional survey,

12   whether it is a *Squirt* survey or *Eveready* survey is improperly designed because their mark

13   wasn't top-of-mind for participants -  even as they simultaneously claim their mark is strong

14   enough to merit protection.[11]   The International Trademark Association (INTA) has observed

15   that the court in *Hypnotic Hats* "gave minimal weight to a Squirt survey (but declined to

16   exclude it) because of the court's finding that the parties' marks would not likely be

17   encountered in close proximity under realistic marketplace conditions."[12] The court in *Hypnotic*

18   *Hats*, also, expressed the opinion that an *Eveready* survey would also not have been appropriate

19   because the senior mark is not "top of mind" for consumers.[13] While using the term "top of

---

[10] *Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, No. 1:15-CV-06478 (ALC) (S.D.N.Y. Sept. 28, 2018),  available at
https://law.justia.com/cases/federal/district-courts/new-york/nysdce/1:2015cv06478/446273/125/

[11] *Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, No. 1:15-CV-06478 (ALC) (S.D.N.Y. Sept. 28, 2018).

[12] Poret, Hal, *An Empirical Assessment of the Eveready Survey's Ability to Detect Significant Confusion in Cases of Senior Marks That Are Not Top-of-Mind*, 109 TMR 935 (Nov.–Dec. 2019) (INTA), available at
https://www.inta.org/wp-content/uploads/public-files/resources/the-trademark-reporter/vol109_no6_a1_poret.pdf

[13] *Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, No. 1:15-CV-06478 (ALC) (S.D.N.Y. Sept. 28, 2018).

**Brief #1 :**  Supplemental Brief: Rethinking Trademark Confusion Tests in the AI Era
Case No.:3:24-cv-00669-WHA

1    mind," the court also referred to "the accessibility of the senior mark in memory," apparently

2    making the mistake of equating these two concepts. *Id.*    This inconsistency underscores the

3    *Eveready* test's limited evidentiary value outside the context of famous marks.

4        18.    Furthermore, *Eveready's* origins in the mid-1970s mean it was developed for a very

5    different marketplace. It predates the Internet and was meant to simulate a consumer seeing a

6    product in isolation on a store shelf or in an ad, then gauging if they think it's related to another

7    brand. It does not translate to today's browser based, Google and Microsoft Bing search engine

8    environment. Bing AI-powered responses are used in 34% of all Bing queries, and Google's

9    SGE (Search Generative Experience), which accounts for 19% of Google's searches as of April

10   2025.[14] Nor does it have any relevance in AI assistant environments (Perplexity, OpenAI's

11   ChatGPT, and Anthrophic's Claude), where a consumer's initial exposure to a mark may come

12   via algorithmic suggestion rather than a clear, standalone product encounter.    Such products

13   have completely changed the search landscape in the last two years, with many users now rarely

14   going to Google.[15]    Indeed, OpenAI has just this month announced the Atlas browser which is

15   quickly gaining in popularity.[16]    "Instead of going to Google, users can type questions or

16

---

17   [14] Lee, Robert A., *Bing vs. Google Statistics 2025: Market Share, AI, and User Trends*, SQ
18   Magazine (Oct. 1, 2025), available at https://sqmagazine.co.uk/bing-vs-google-statistics/
     [15] AI Search Startup Perplexity AI Is Challenging Google LLC While Using Its Data," *The*
19   *Information*, available at
20   https://www.theinformation.com/articles/ai-search-startup-perplexity-is-challenging-google-whi
     le-using-its-data?utm_source=google&utm_medium=cpc&utm_campaign=23099657190_&utm
21   _content=&utm_term=&gad_source=1&gad_campaignid=23109675016&gbraid=0AAAAADN
     JgqS0Km-0dFSyMVsqBNCwbbuk9&gclid=Cj0KCQjw9obIBhCAARIsAGHm1mQwb5sVP6q
22   GH_2GXu6TLqnQevPycGTyQl7Np24s58CX03JQID8uu9QaAmcgEALw_wcB/ ; "How
23   ChatGPT Atlas, Google AI Overviews, and Perplexity Are Changing Search," *YouGotUs.ai*,
     available at
24   https://www.yougotus.ai/how-chatgpt-atlas-google-s-ai-overviews-and-perplexity-are-changing-
     search?utm_source=chatgpt.com ;
25   [16] Metz, Cade. "OpenAI Unveils Web Browser Built for Artificial Intelligence." *The New York*
26   *Times*, Oct. 21, 2025. Available at
     https://www.nytimes.com/2025/10/21/technology/openai-web-browser-atlas.html; AFP,
27   "OpenAI Unveils Search Browser in Challenge to Google," *Digital Journal*, Oct. 21, 2025,
     available at
28   https://www.digitaljournal.com/tech-science/openai-unveils-search-browser-in-challenge-to-goo
     gle/article

1    prompts into the address bar and get an AI-generated answer immediately, as if the whole web

2    is being consulted for them."[17]   And, Google and Bing now do the same thing above of search

3    results.   For instance, if an AI chatbot erroneously refers to the junior service (LawFirms.com)

4    when asked about the senior (LegalForce, or vice versa), the consumer isn't *seeing* the junior's

5    website alone – they are receiving mixed or contextual information.    And, since AI based

6    search, including Google considers "visual" similarity when generating search results, logo

7    confusion can and  does occur when browser are consulted.[18]   This is especially true in this

8    case, where the Defendant's corporate representative admitted during his deposition--read into

9    the record--that the Defendant engaged in "scheme-y" tactics to divert search traffic using

10   "Black Hat SEO" techniques. He testified:

11           19. "The Lawfirms.com was cross-linking to Nolo, which was discovered in a

12               Google Search Console. Because it was a site we owned, part of the same

13               network as Nolo, it created an issue commonly known as a private blog

14               network--a scheme-y way of passing Google PageRank from one site you

15               own to another."[19]

16       20.    "Black Hat SEO" is somebody who is intentionally trying to manipulate Google's

17   algorithms, was to build multiple Web sites and point them to the one Web site that they wanted

18   to rank" as admitted by the Defendant's corporate representative, and apparently used by the

19   Defendant  for  the  relevant  time  period.[20]   An *Eveready* survey cannot easily recreate that

20

21   [17] Metz, Cade. "OpenAI Unveils Web Browser Built for Artificial Intelligence." *The New York Times*, Oct. 21, 2025. Available at

22   https://www.nytimes.com/2025/10/21/technology/openai-web-browser-atlas.html; AFP,

23   "OpenAI Unveils Search Browser in Challenge to Google," *Digital Journal*, Oct. 21, 2025, available at

24   https://www.digitaljournal.com/tech-science/openai-unveils-search-browser-in-challenge-to-google/article

25   [18]Chechik, Gal, Varun Sharma, Uri Shalit & Samy Bengio, Google Research, "An Online

26   Algorithm for Large-Scale Image Similarity Learning." *Proceedings of the 22nd Annual Conference on Neural Information Processing Systems* (NIPS 2009): 306–314 (2009).

27   [19]*Deposition Testimony of James Duffy Keating*, read in on October 28, 2025 by Plaintiff's counsel from pg 28, lines 21-25, and pg 29, lines 1-5.

28   [20]*Deposition Testimony of James Duffy Keating*, read in on October 28, 2025 by Plaintiff's counsel from pg 28, lines pg 29, lines 16-22.

**Brief #1 :**  Supplemental Brief: Rethinking Trademark Confusion Tests in the AI Era
Case No.:3:24-cv-00669-WHA

nuanced scenario. In short, because it assumes knowledge the average online consumer might not have and ignores context, the *Eveready* test is inapplicable here. It would provides no probative value on the crucial question of whether AI-driven, browser based initial confusion is likely in the time period relevant in the instant case (November 2023 to July 2024).

21.     The Squirt survey (from *SquirtCo v. Seven-Up Co.*, 8th Cir. 1980) was introduced as an alternative method, especially suitable when consumers encounter both the senior and junior marks in proximity (for example, on the same store shelf or in sequential magazine ads). In a Squirt test, respondents are actively presented with both marks – it does not assume prior familiarity with the senior mark**s**, because it explicitly identifies or shows it to respondents – and then asks if people believe the two products or brands are connected.[21] Typically, participants might be shown a mock-up where *both* the plaintiff's and defendant's branded offerings appear (side by side or one after the other), and questions follow like: *"Do you think Brand A and Brand B are made by the same company?"* (or affiliated, or sponsored by the same source). In the original *SquirtCo* case, consumers in a supermarket were asked whether *"SQUIRT" soda and "QUIRST" soda* came from the same company after seeing them in a realistic display, resulting in a notable percentage saying "yes".

22.     By presenting both marks, Squirt surveys can indeed detect confusion that an *Eveready* survey would miss – particularly for a weaker senior mark, since respondents no longer need independent recall. However, this strength is also its potential flaw. Because it *artificially places the two brands together* (which rarely happens even even in the physical world), the Squirt format can inflate the likelihood of confusion in situations where, in reality, consumers might not encounter the marks jointly. As commentary notes, Squirt is most appropriate when the marketplace itself presents the two marks in close proximity (whether spatially or temporally). If consumers *actually* often see the junior and senior ads appearing together (for instance, in consecutive search results or side-by-side product listings), a Squirt-style survey can mimic that environment.

---

[21]McDonald, Bruce A., *Comments on Use of Survey Evidence in Trademark U.S. Litigation,* submitted to the Intellectual Property Court of the Russian Federation (June 26, 2020)

**Brief #1 :** Supplemental Brief: Rethinking Trademark Confusion Tests in the AI Era
Case No.:3:24-cv-00669-WHA

23.    But if the junior's use is such that a consumer would normally encounter it *alone* (as is common with voice search answers or single-result AI recommendations), then showing both marks to respondents may distort the reality. Some commenters have critiqued *Squirt* surveys as inherently leading – since they introduce the senior mark to people who may never have otherwise considered it, and then ask about a connection, it can "plant an idea" of association that wouldn't naturally occur. In fact, American courts are split on this: many treat Squirt surveys warily, excluding them if the side-by-side presentation is deemed an unrealistic scenario for the average consumer, while others accept them as probative so long as the methodology is sound and reflective of the marketplace. *Id.*

24.    In the present context, a traditional Squirt survey has limited relevance. Consumers discovering services via AI-based tools are *not* necessarily seeing the senior and junior brands simultaneously in a clear-cut way. Consider a user asking an AI assistant or browser based Google: "Find me law firm services." When users search for terms like "intellectual property law firms," "file a trademark online," or "best patent attorneys near me," Google's algorithm often serves both branded firms like LegalForce RAPC and legal directories such as LawFirms.com together in the same search results. This overlap becomes even more pronounced when cross-linking occurs between LawFirms.com and Nolo's attorney directory, as was admitted by the Defendant's corporate representative.[22] By linking these two sites within the same ownership network, the operators effectively created what is known in SEO as a private blog network (PBN) - a "scheme-y" method of passing Google PageRank between related sites to manipulate search visibility. Such cross-linking artificially and intentionally has a tendency to cause an amplification of LawFirms.com's prominence for general search terms like "intellectual property lawyers" or "trademark attorneys," causing it to appear alongside or even above legitimate law firm websites like LegalForce RAPC that compete fairly in organic rankings. This coordinated linking strategy not only misleads consumers seeking qualified IP

---

[22]**Q:** "So the attorney directory still stayed as a hyperlink on the top navigation bar; correct?  **A:** Correct, that would have -- that would have required development work." *Deposition Testimony of James Duffy Keating*, read in on October 28, 2025 by Plaintiff's counsel from pg 30, lines 17-21.

**Brief #1 :** Supplemental Brief: Rethinking Trademark Confusion Tests in the AI Era
Case No.:3:24-cv-00669-WHA

1    counsel but also distorts competition by using black-hat SEO tactics to divert traffic through a

2    network of interlinked, commonly owned sites.

3        25.    The AI based search engine (Google, Bing, or even chatbot) might respond with a

4    single recommendation: "[JuniorMark] is a top-rated provider in that area." The consumer hears

5    or sees only the junior's name in response to their query about the senior – a scenario that

6    neither the pure *Eveready* nor pure *Squirt* model replicates. There is no *side-by-side comparison*

7    for the consumer; the interaction is sequential and possibly lacking any disclosure that

8    "[JuniorMark]" is unrelated to what they asked for. Even if an AI presents a list of a few

9    options, it might list, say, the junior name first (due to algorithmic ranking) and the senior name

10   second – a sequence that could suggest the first result is the thing they're looking for. A

11   standard Squirt survey would show both names and directly pose the affiliation question, but a

12   real browser interaction would not explicitly ask the user to compare the two brands – the user

13   might assume relevance or connection simply because the AI included both in the answer. Thus,

14   while the Squirt format was an attempt to be *flexible for environments where consumers see*

15   *marks in close proximity, such as search results*, it still operates within a 1980 paradigm of

16   consumer perception. It does not adequately simulate an AI recommendation system where

17   contextual and *implicit* associations form in the consumer's mind without deliberate

18   side-by-side scrutiny. In short, like the *Eveready* test, the Squirt test was *"created prior to the*

19   *personal computer era, the internet era, and now the AI era"* and has become antiquated for our

20   purposes. Neither survey format can reliably measure the likelihood of confusion or initial

21   interest diversion in the scenario at hand.

22

23   **IV.    LEGALFORCE'S PROPOSAL: TOWARD A REVISED FRAMEWORK FOR**

24   **INITIAL INTEREST CONFUSION IN THE BROWSER SEARCH BASED AI ERA**

25       26.    Given the foregoing, we urge this Court (and the Ninth Circuit more broadly) to

26   adopt a revised, context-sensitive framework for evaluating likelihood of confusion – especially

27   initial interest confusion – in cases involving AI-driven browser search and recommendations.

28   Rather than applying outdated one-size-fits-all tests, courts should take a *case-by-case*

*analytical approach*, guided by principles that reflect modern realities. We propose the following considerations be integrated into the confusion analysis for such cases:

27.    **Algorithmic Presentation of Marks:** Examine *how* the junior and senior marks are encountered through technology. Does an AI or search engine **suggest or substitute** the junior mark when a consumer is actually searching for the senior? The nature of the presentation (e.g. a direct answer, a top-ranked suggestion, an autocomplete, etc.) should influence the likelihood of confusion analysis. For instance, if a chatbot, without clarification, recommends the junior service in response to a query about the senior service, that strongly indicates a high risk of initial interest confusion unique to the AI context.

28.    **Consumer Perception in AI Interactions:** Recognize that consumers tend to **trust and follow AI recommendations** in a different manner than they do traditional ads or search listings. The average user may not apply the same skepticism or careful comparison when an AI assistant presents a result, because the interface often provides a **single streamlined solution**. Courts should account for the fact that in an AI-mediated transaction, the *"reasonably prudent consumer"* might be less likely to discern competing sources, especially if the AI does not make distinctions explicit. In the Ninth Circuit's past analysis of online confusion (e.g. in keyword advertising cases), the court noted that clear labeling and the sophistication of internet users can reduce confusion.[23] But in a generative AI context, labeling may be absent or consumers may assume any result given is the "right" one. Thus, the presumed level of consumer care or savvy should be adjusted – even a relatively careful consumer can be misled when the interface blurs source identification.

29.    **Expanded Evidence of Confusion:** Permit and weigh new types of evidence. Courts should be open to technological evidence such as user click-through data, AI query logs, or transcripts of AI interactions demonstrating confusion. For example, if analytics show that a large percentage of users who query "[SeniorMark]" end up clicking on or engaging with "[JuniorMark]" due to how results are displayed, that is powerful evidence of likely confusion

---

[23]*Multi-Time Machine, Inc. v. Amazon.com, Inc.*, 792 F.3d 1070 (9th Cir. 2015), available at https://cdn.ca9.uscourts.gov/datastore/opinions/2015/07/06/13-55575.pdf

1    at the initial interest stage. Likewise, if an AI system has erroneously conflated the two marks in

2    its training data or output (something that could be established through expert testimony or

3    discovery of the AI's behavior), that supports a finding that consumers relying on that AI are

4    likely to be confused. Traditional survey evidence should not be discarded altogether, but survey

5    methodologies may need to be updated – e.g. a survey could simulate an AI voice assistant

6    session to see if listeners are confused about which company is being recommended. In any

7    event, courts should not rigidly require the old survey formats when they plainly fail to replicate

8    the scenario at issue.

9        30.    **Dynamic and Ongoing Confusion Harm:** Consider the *persistence* of confusion in

10   the online environment. As discussed, the harm from initial interest confusion today can be

11   magnified by mechanisms like retargeted advertising and personalized content. A single

12   misdirection can result in the junior mark repeatedly reappearing in the consumer's online

13   sphere (in social media ads, search suggestions, etc.), continuously reinforcing the false

14   association. Judges should factor in this dynamic harm when assessing the need for injunctive

15   relief. In essence, the "actual confusion" factor can occur not just as a snapshot (did the

16   consumer momentarily think X was Y?) but as a *trajectory* (was the consumer's path to the

17   senior mark derailed or intercepted in a way likely to cause loss of business or goodwill?). If so,

18   injunctive relief is warranted to prevent the junior user from capitalizing on that diverted

19   attention.

20       31.    **Technological Transparency and Responsibility:** Encourage inquiry into what the

21   AI or search provider does to mitigate confusion. While this dispute is between private parties,

22   the court can observe whether the environment includes features that reduce confusion (for

23   example, does the search AI clearly state "We couldn't find [SeniorMark], here are alternatives"

24   or does it just present the alternative?). If the interface lacks such clarity, the likelihood of

25   confusion is higher. In the long run, trademark law may need to extend doctrines like

26   contributory infringement or initial interest confusion to the platform providers themselves if

27   they consistently misdirect consumers.[24]   For now, in evaluating the present claims, the court

28

---

[24]Bharti, Sneha, *Trademark Law in the AI Era: Adapting to a Changing Consumer Landscape*,

1    can take into account that the AI-mediated context had no built-in confusion disclaimers,

2    making the junior user's piggybacking on the senior's name all the more problematic.

3        32.    Ultimately, we submit that no rigid formula can replace judicial judgment in these

4    cases. The Court should apply the traditional likelihood-of-confusion factors with a high degree

5    of flexibility, mindful that *the "marketplace" here is an intelligent, adaptive digital system*

6    *rather than a brick-and-mortar aisle*. The above considerations will help ensure the analysis

7    remains grounded in the realities of consumer perception in 2025, rather than in the assumptions

8    of 1975 or 1985.

9    **V.   RECOGNIZING INITIAL INTEREST CONFUSION IN THE NINTH CIRCUIT**

10       33.    The Ninth Circuit has long recognized that trademark infringement can occur even if

11   consumer confusion is temporary or dispelled before the point of sale, under the doctrine of

12   initial interest confusion.[25] Initial interest confusion refers to a situation where a consumer is

13   momentarily misled by a similarity between marks, creating an initial interest in the junior

14   user's product or website, even if the consumer realizes the true source before completing a

15   purchase. *Id.* Crucially, the Ninth Circuit holds that **"***[a]lthough dispelled before an actual sale***

16   ***occurs, initial interest confusion impermissibly capitalizes on the goodwill associated with a***

17   ***mark and is therefore actionable trademark infringement.***"** [26] In other words, a defendant cannot

18   escape liability merely because consumers figure out the truth at the last moment; the law

19   protects against the unfair advantage gained from the plaintiff's goodwill during that initial

20   period of confusion.

21       34.    This principle was famously illustrated in *Brookfield Communications, Inc. v. West*

22   *Coast Entertainment Corp.,* 174 F.3d 1036 (9th Cir. 1999).[27] There, the Ninth Circuit likened

---

24   IPLF ("IP and Legal Filings"), Apr. 26 2025,
     https://www.ipandlegalfilings.com/trademark-law-in-the-ai-era-adapting-to-a-changing-consum
25   er-landscape/

26   [25]Playboy Enterprises, Inc. v. Netscape Communications Corp., 354 F.3d 1020 (9th Cir. 2004),
     consolidated with *Playboy Enterprises International, Inc. v. Excite, Inc.*, Nos. 00-56648 &
27   00-56662 (9th Cir. argued Sept. 11, 2001; decided Jan. 14, 2004), available at:
     https://law.justia.com/cases/federal/appellate-courts/F3/354/1020/576012/
28   [26]*Id.*
     [27]Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036 (9th Cir.

1    the defendant's conduct to a highway billboard analogy: if a competitor (e.g. Blockbuster) put

2    up a false road sign for "West Coast Video" at an exit where only Blockbuster is located, drivers

3    seeking West Coast would take that exit and, finding only Blockbuster, might rent a movie

4    there. Even if those customers realize upon arriving that it's Blockbuster and not West Coast,

5    Blockbuster has *still derived a benefit* by diverting them – "profiting unfairly from the goodwill

6    established by the West Coast Video mark". The Ninth Circuit held that this kind of

7    bait-and-switch initial diversion constitutes trademark infringement because it trades on the

8    established reputation of the mark owner. Similarly, using another's mark in website metadata

9    or ads to draw in customers (even if the site is clearly labeled once clicked) was found

10   actionable in *Brookfield*, because by using a junior mark (LawFirms.com) to divert people

11   looking for the business of the senior mark (LegalForce) to its website, the defendant

12   improperly benefits from the goodwill that LegalForce developed in its logo trademark.

13       35.    Since *Brookfield*, the Ninth Circuit has consistently applied initial interest confusion

14   to modern contexts like internet advertising, search results, and meta-tags. For example, in

15   *Playboy Enterprises v. Netscape*, the defendants sold advertising keywords for "playboy" and

16   "playmate" to adult content providers, so that banner ads for adult sites would appear when

17   users searched those terms. The Ninth Circuit reversed summary judgment for the defendants,

18   finding a triable issue on initial interest confusion. The court explained that users might initially

19   believe unlabeled banner ads were affiliated with Playboy and click on them; even if users

20   realize "Through initial consumer confusion, the competitor "will still have gained a customer

21   by appropriating the goodwill" that the trademark rights holder has developed in its mark. In

22   short, the misdirection of consumers at the very start of their search is itself a harm, because it

23   leverages the plaintiff's brand equity to capture interest. The Ninth Circuit concluded that such

24   use of another's trademark to lead consumers to a competitor's website is actionable, even

25   though consumers ultimately *knew* whose site they were on before buying anything.

26       36.    Notably, the Ninth Circuit's standard does not require point-of-sale confusion for

27   infringement. The court in Playboy explained that even though "there is no source confusion in

28

1999), available at https://law.justia.com/cases/federal/appellate-courts/F3/174/1036/519212/

1    the sense that consumers know [who] they are patronizing, ... there is nevertheless initial

2    interest confusion in the sense that, by using `moviebuff.com' or `MovieBuff' to divert people

3    looking for `MovieBuff' to its website, [the defendant] improperly benefits from the goodwill

4    that [the plaintiff] developed in its mark." *Id*. at 1062.   What matters is that the defendant

5    "improperly benefits from the goodwill" of the senior mark in capturing initial customer

6    attention. *Id.*

7

8    **VI.   GOODWILL MISAPPROPRIATION AND POST-VISIT CONFUSION HARM**

9        37.    The common thread in initial-interest confusion cases is misappropriation of the

10    plaintiff's goodwill. The law recognizes that a trademark's value lies in the consumer goodwill

11    and positive associations it embodies. When a defendant distracts or lures consumers by using a

12    mark in a confusingly similar way (for instance, in a URL, search keyword, or ad), it taps into

13    that goodwill unfairly. Even if consumers eventually realize the truth, the defendant has already

14    derived a benefit (traffic, an opportunity to make a sales pitch, or even a completed sale) by

15    exploiting the plaintiff's reputation. Meanwhile, the plaintiff faces a twofold injury: (1) a lost

16    opportunity to capture those consumers who were initially seeking the plaintiff's product, and

17    (2) a risk of erosion of its brand's goodwill if consumers come away with mistaken impressions.

18        38.    Importantly, this harm can persist after the initial "visit" or interaction, which is why

19    we propose framing it as post-visit goodwill confusion. This concept is analogous to the

20    well-established post-sale confusion doctrine. In post-sale confusion (recognized in the Ninth

21    Circuit and elsewhere), even if a direct purchaser was not confused at the time of sale (often

22    they knowingly bought a knock-off), liability can still arise because observers or later

23    consumers might be confused – for example, seeing a fake designer bag on the street and

24    mistakenly attributing low quality to the genuine brand. The Ninth Circuit has endorsed this

25    view, noting that post-sale confusion can damage a brand's cachet or exclusivity, an injury

26    sufficient to warrant injunctive relief.  For instance, the Ninth Circuit upheld an injunction in

27    *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747 (9th Cir. 2018) to stop sale of look-alike

28    sneakers, because even buyers who knew they weren't buying real Adidas could cause

1   onlookers to confuse the products, diluting the perceived exclusivity and goodwill of Adidas's

2   mark. In that case, harm to brand value (through loss of exclusivity) was recognized as

3   actionable, even absent point-of-sale confusion.

4     39.  By the same token, post-visit confusion refers to the lingering or downstream effects

5   on consumer perception after a consumer's initial encounter with the defendant's misleading

6   use. A consumer might visit the defendant's website or page thinking it was related to the

7   plaintiff (due to a confusing ad or search result). Once on the site, they may quickly realize it's a

8   different company, yet they might stay and make a purchase or otherwise engage with the

9   competitor bu seeing and associating a logo. Crucially, some portion of these consumers may

10  never correct their earlier assumption about affiliation, or may assume an ongoing connection

11  ("Maybe that site is authorized by [Plaintiff]" or "Company X must be related to Company Y

12  since it came up when I searched Y"). Others might simply be satisfied with the alternative they

13  found and not resume searching for the plaintiff's site. In all these scenarios, the defendant has

14  "misappropriated the goodwill" of the mark to capture customers, and there is a non-trivial risk

15  that the plaintiff's brand will suffer reputational harm. For example, a consumer who had a poor

16  experience on the defendant's site might carry over a negative impression, mistakenly

17  attributing it to the plaintiff ("I searched for [Plaintiff] and ended up on that awful site – maybe

18  [Plaintiff] isn't so great after all"). This erosion of consumer trust and harm to a small business

19  brand goodwill is precisely the injury trademark law aims to prevent.

20    40.  The proposed doctrinal refinement is to explicitly incorporate "post-visit goodwill

21  confusion" as a factor in the likelihood-of-confusion analysis, particularly in internet and digital

22  contexts for small businesses. Courts in the Ninth Circuit already apply the eight *Sleekcraft*

23  factors to determine likelihood of confusion, but they do so **flexibly in online cases**,

24  recognizing that some factors (like *marketing channels* or *degree of consumer care*) may play

25  out differently on the internet. We urge courts to give due weight to evidence that a defendant's

26  conduct creates initial confusion and a risk of subsequent harm to brand goodwill, even if visual

27  dissimilarities or consumer care might prevent point-of-sale confusion. In practice, this means

28  focusing on factors such as: the context of th**e encounter** (e.g. how a search result or app listing

is presented), the clarity of secondary logo and branding likelihood of confusion *after* someone is misdirected to a website and sees a logo. The Ninth Circuit's recent decisions underscore this approach. In *Network Automation, Inc. v. Advanced Systems Concepts*, the court cautioned that in internet advertising cases, "Unreasonable, imprudent and inexperienced web-shoppers are not relevant" – the reasonably prudent online consumer is expected to notice labels and context.[28] Thus, the court noted, clearly labeled search ads or results *can* mitigate confusion, whereas ambiguous or misleading presentations heighten the risk.

## VII  APPLICATION TO BROWSER AND SMARTPHONE CHANNELS

41.    In modern commerce, initial-interest confusion often manifests via web browsers, search engines, and smartphone platforms. Consumers frequently encounter trademarks through search query results, pay-per-click ads, social media, or mobile app listings. These channels can generate confusion in subtle ways. Browser-based confusion may occur when a competitor's webpage uses a domain name or meta-tags similar to the plaintiff's mark, causing it to appear in search results for the plaintiff (as in *Brookfield* and *Playboy*). Smartphone-based confusion can arise through app names or mobile search results that mimic a famous mark. The *same legal principles apply*: if the overall presentation is such that consumers might initially believe they're heading toward the senior brand when in fact they are being redirected to a junior user, a likelihood of confusion can be found. The Ninth Circuit has stressed that context and clarity are key in these environments. For example, if an app store listing for an app uses a name/trademark close to another and lacks clear source identifiers, a user might download it thinking it's affiliated with the other brand. Similarly, on a small smartphone screen, where only part of a webpage title or URL is visible, a misleading use of a mark could more easily cause initial confusion. Courts should therefore scrutinize how the mark is encountered in these channels – e.g., Does the search result or link clearly identify the source site's actual name? Is the user quickly disabused of confusion, or do they only find out after a "visit" that it's a different source?

---

[28]*Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171 (9th Cir. 2010).

**Brief #1 :**  Supplemental Brief: Rethinking Trademark Confusion Tests in the AI Era
Case No.:3:24-cv-00669-WHA

42.    Notably, our focus is on browser-based and smartphone-based initial interest channels because that is where we assume the evidence lies in the present case. (The record here indicates that the *Sleekcraft* likelihood-of-confusion factors are satisfied, and the testimonial evidence on confusion supports Plaintiff, without needing to rely on side-by-side logo comparison.) We therefore set aside visual logo similarity analysis – the court may assume that element is met by the evidence. Instead, we emphasize the initial confusion in the online consumer's mind and its impact on goodwill. If, for instance, testimony or surveys show users clicked on Defendant's web link thinking it was related to Plaintiff, or that Plaintiff's name/reputation drew them in, that is powerful evidence of initial interest confusion. Even absent a completed sale, such traffic diversion and association carry competitive and reputational harm, warranting a finding of infringement.

## IIX.  CONCLUSION

43.    In sum, the proposed standard would explicitly recognize post-visit goodwill confusion as actionable within the likelihood-of-confusion framework. Confusion need not persist until the point of purchase to be legally significant; it suffices that the defendant's conduct induces consumers to engage with the junior product under a mistaken belief, thereby exploiting and diverting the senior mark's goodwill. The Ninth Circuit's precedent already supports this reasoning. By examining the entire consumer experience--from initial interest to click-through behavior and the resulting harm to brand reputation--courts can more effectively protect trademark owners in the digital marketplace. Where, as here, the evidence demonstrates such confusion, a finding of infringement and corresponding injunctive relief are warranted to prevent further erosion of goodwill and ongoing consumer deception. This interpretation best fulfills the Lanham Act's purpose of safeguarding consumers and business reputations, even when confusion is momentary but commercially exploitable.

44.    Traditional survey methodologies like the *Eveready* and *Squirt* formats no longer capture how modern consumers interact with brands through algorithms, voice assistants, and recommendation systems. The *Eveready* test fails when the senior mark lacks universal

1    recognition, while the Squirt format misleads when marks are not actually encountered together.

2    These outdated tools obscure genuine confusion in today's AI-driven environment. Courts must

3    therefore move beyond rigid presumptions and adopt a fact-intensive, context-aware approach

4    that reflects how AI platforms present information and how consumers respond to it.

5        45.    The Ninth Circuit is uniquely positioned to lead this doctrinal evolution. It has long

6    recognized initial interest confusion; now it should refine the doctrine to encompass

7    AI-mediated confusion by emphasizing technological context, source attribution, and innovative

8    evidence. Whether as an adaptation of the *Sleekcraft* factors or as a distinct analysis, this

9    framework will ensure that trademark law remains faithful to its core principles while

10   addressing new realities of the digital age. Applying this updated standard here compels one

11   conclusion: the junior user's exploitation of the senior mark through AI-driven channels creates

12   a substantial likelihood of confusion warranting injunctive relief. Adopting this approach will

13   provide clarity, consistency, and fairness-ensuring that the Ninth Circuit's trademark

14   jurisprudence continues to protect goodwill in an era defined by evolving technology.

15

16    Respectfully submitted this October 29, 2025.

17                                    LEGALFORCE RAPC WORLDWIDE P.C.

18                                    /s/ Raj V. Abhyanker_____
                                      Raj V. Abhyanker
19                                    California State Bar No. 233,284
                                      Attorney for Plaintiff:
20                                    LegalForce RAPC Worldwide, P.C.

21

22

23

24

25

26

27

28

**Brief #1 :**  Supplemental Brief: Rethinking Trademark Confusion Tests in the AI Era
Case No.:3:24-cv-00669-WHA