1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                          NORTHERN DISTRICT OF CALIFORNIA

8

9

10   LEGALFORCE RAPC WORLDWIDE
     P.C.,
11                                                No.  C 24-00669 WHA
                    Plaintiff,
12
           v.
13
                                                  **FINDINGS OF FACT AND**
14   MH SUB I, LLC,                               **CONCLUSIONS OF LAW**

                    Defendant.
15
     _____
16

17         Law firm LegalForce RAPC Worldwide P.C. brought this trademark action accusing

18   online referrer to law firms MH Sub I, LLC of infringing two service marks.

19         Following a four-day bench trial, each side proposed findings of fact and each side

20   agreed with or objected to each of the other side's proposals.  While the district judge has read

21   the proposed findings and adopted some of them, this order need not and does not address each

22   one.  This order makes its own findings from the actual evidence at trial.  That said, it also

23   accepts as proven all stipulated facts and all proposed findings of fact written by one side and

24   expressly and wholly agreed to by the other side.

25         All declarative statements anywhere in this order are factual findings.  Citations to the

26   record are provided only as to particulars that may assist the court of appeals.  Citations to the

27   first day of trial are to "Oct. 7 Tr." and, because the transcript numbering then restarted by

28   mistake, citations to all other days of trial are to "Tr."

United States District Court
Northern District of California

## FINDINGS OF FACT

**1.    PLAINTIFF'S BUSINESS AND MARKS.**

### A.    PLAINTIFF'S BUSINESS.

1.    Plaintiff LegalForce RAPC Worldwide P.C. is a law firm specializing in trademark law and providing limited services in other areas of intellectual property law.  For instance, it registers trademarks at low cost with the U.S. Patent and Trademark Office.  Plaintiff's chief executive officer is Raj Abhyanker, who is also its trial counsel in this action (in the latter role referred to as "Attorney Abhyanker").

2.    Plaintiff uses the service name LegalForce and the webpage www.legalforce.com.  The law firm also owns a search engine for trademarks that primarily has used the service name Trademarkia and the website www.trademarkia.com.  The search engine has attracted visitors looking for trademarks and has converted some into paying clients for the law firm.  The service marks for "Trademarkia" are not at issue.  No mere service name is at issue.

### B.    PLAINTIFF'S MARKS.

#### (i)    Plaintiff's Composite.

3.    In 2012, prior to plaintiff's formation, Mr. Abhyanker began using a service mark while providing legal services in California and across the United States.  In 2013, the U.S. Patent and Trademark Office approved the mark and it issued on the principal register as Registration No. 4,346,898.  In 2019, the mark became incontestable.  And, in 2021, it was transferred to plaintiff.

4.    That mark is for exclusive use in Class 45, Personal & Legal & Social Services.  That class includes "law firm services" as well as services "providing general information in the field of legal services via a global computer network."

5.    The mark comprises a symbol and a stylized word.  The symbol is a parallelogram colored orange (with a gradient from lighter to darker) and having two rounded corners (top left and bottom right) and two sharp ones (the other two); nested inside are the lighter-colored letters "$L^F$".  The stylized word is to the right of this symbol and reads: "**Legal**Force".

6.      This mark is referred to here as "Plaintiff's Composite."

> **Registration No. 4,346,898**
> **("Plaintiff's Composite")**
>
> 

      *(ii)*    ***Plaintiff's Symbol.***

7.      In 2012, Mr. Abhyanker also began using in some instances just the symbol portion of the mark above — slightly modified, and without the stylized word portion.

8.      Then, in January 2024, in anticipation of this litigation, plaintiff applied to register just this symbol expressly without any claim to color.  And, in June 2025, soon before trial, that registration issued on the principal register as Registration No. 7,911,138.

9.      This mark is referred to here as "Plaintiff's Symbol."

> **Registration No. 7,911,138**
> **("Plaintiff's Symbol")**
>
> 

10.      Plaintiff failed to submit certified copies of the above registrations before our October 2025 bench trial and had no acceptable excuse for the failure.  Instead, plaintiff submitted non-certified copies before trial, then submitted certified copies after the trial record closed.  Plaintiff could have and should have ordered the certified copies in time for trial.  This is emblematic of the way plaintiff has prosecuted this entire case.  Nevertheless, this order will treat the certificates as having been proven.

**2.      DEFENDANT'S BUSINESS AND MARKS.**

      **A.      DEFENDANT'S BUSINESS.**

11.      Defendant MH Sub I, LLC, doing business as Internet Brands, is a holding company of mostly online properties including WebMD, Martindale, Nolo, Avvo, and — especially relevant here — www.lawfirms.com.  Defendant does not operate any law firm.

3

United States District Court
Northern District of California

12.     At all relevant times, defendant has offered online referrals to law firms.  People having legal problems have been attracted by advertising to www.lawfirms.com, where some have filled out an interest form.  Defendant has packaged the resulting client "leads" and provided them to paying lawyers, including lawyers listed on online directories defendant also owns, such as www.avvo.com.  The service marks for sites other than for www.lawfirms.com are not at issue.  Again, no mere service names are at issue.

### B.    DEFENDANT'S MARKS.

#### (i)    Defendant's Composite.

13.     From November 2023 to July 2024, defendant used an unregistered service mark in connection with referrals to law firms made in California and across the United States through www.lawfirms.com.

14.     The mark comprised a symbol and a stylized word.  The symbol was a parallelogram colored orange having two sharp corners (in the top left and bottom right) and two rounded ones (the other two); nested inside was a white Roman column.  The stylized word was to the right of this symbol and read:  "**LawFirms**.com."

15.     This mark is referred to here as "Defendant's Composite."



("Defendant's Composite")

#### (ii)    Defendant's Replacement.

16.     In July 2024, soon after this litigation began, defendant began using a modified version.  The symbol's color changed to crimson, and the symbol's corners changed so that both top ones were sharp while both bottom ones were rounded; it still contained the column.  The stylized word remained intact to the right.

17.     This mark is referred to as "Defendant's Replacement."



("Defendant's Replacement")

18.    In February 2024, plaintiff brought suit alleging primarily that Defendant's Composite infringed Plaintiff's Composite and Plaintiff's Symbol (the latter not yet registered).  The suit also alleged false advertising.

19.    At our first hearing in the action, the district judge suggested that defendant change the color of the parallelogram in Defendant's Composite from orange to some other color, recommending gray, blue, or green as non-aggressive colors.  This was done to try to end the case and to spare both sides the cost of litigation.  It was not done because the district judge thought there was (or was not) infringement.  No finding or suggestion of infringement was made by the district judge.  Defendant did change the mark, as set out above — from Defendant's Composite to Defendant's Replacement.

20.    Plaintiff, however, did not drop the lawsuit but shortly before trial did drop any claim for damages and sought only injunctive relief.  Both sides have spent considerable sums litigating this case and fighting endlessly over discovery.  This led to a four-day bench trial on October 7, 27, 28, and 29, all 2025.  To accommodate one of plaintiff's witnesses, we took that witness on October 7 with the testimony subject to any orders following our pretrial conference on October 22 (*see* Dkt. No. 263 (order re testimony); Dkt. Nos. 304, 310 (final pretrial conference and order)).

21.    The main issue at trial was likelihood of confusion involving the original Defendant's Composite (because plaintiff professed to be worried that defendant would revert to using it).  As to false advertising, plaintiff had not alleged — nor at trial did plaintiff proffer any evidence of — false statements, false association, or false endorsement other than defendant's use of the accused mark.

22.    So, whether there was any likelihood to confuse consumers between Defendant's Composite (the original one) versus plaintiff's marks became the axis of contention.

United States District Court
Northern District of California

5

**3.**     **SLEEKCRAFT FACTORS.**

23.     This order organizes its further findings under the factors concerning likelihood of trademark confusion from *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979).

### *(i)     No Actual Confusion.*

24.     No one was actually confused or misled by Defendant's Composite (or its Replacement). Indeed, plaintiff produced zero evidence of actual confusion. For example: There is zero evidence that anyone who saw an ad for defendant's referrals service to law firms believed he was seeing an ad for plaintiff's law firm. There is zero evidence that anyone who visited defendant's www.lawfirms.com website, which displayed defendant's marks, believed he was visiting plaintiff's www.legalforce.com website. There is zero evidence that anyone who was referred to a law firm by defendant believed he was being referred to a law firm *by* plaintiff, or believed he was being referred *to* plaintiff.

25.     Plaintiff conceded there was no actual confusion but contends that the other *Sleekcraft* factors point in its favor, and that confusion could arise were use of the accused marks to continue. This order finds otherwise.

### *(ii)     Not the Same Marketing Channels.*

26.     Defendant has not marketed its services using Defendant's Composite (or its Replacement) in the same specific places where plaintiff markets its services using Plaintiff's Composite (or its Symbol), so there has been and will be no occasion for consumers to see both services' marks and to confuse one versus the other. Plaintiff has marketed its services using web search, its own webpages as such, and select social media, as well as at tech conferences and in a one-time retail location.

27.     *Web Search*: Both plaintiff and defendant have used keyword marketing but this order finds that no single web search has returned or will ever likely return both plaintiff's and defendant's websites showing their marks. A business can bid on words a person might use in a Google search when they look for a service, and the top bidder's website is rewarded with a prominent, sponsored placement in the results for the search. Plaintiff produced no credible evidence that plaintiff and defendant — specifically for the websites bearing or likely to bear

6

United States District Court
Northern District of California

the marks at issue — have bid on the same keywords or would.  Defendant did not engage in "keyword squatting," whereby a defendant's keyword bidding makes searches for a plaintiff return results also or instead for a defendant.

28.    Both plaintiff and defendant have used other means to influence how their websites rank and appear in search results.  Plaintiff produced no credible evidence that defendant has undertaken any effort to appear in search results for the same searches as plaintiff, or ever would.  For instance, plaintiff produced no credible evidence that defendant's meta descriptions on www.lawfirms.com, which are read by search engines, have prompted defendant's webpage to appear in the results of any search where plaintiff's webpage would be expected to appear.

29.    At trial, the district judge specifically asked both sides if there was any evidence of any actual web searches returning results showing the actual service marks at issue.  Neither side produced any such evidence.  Plaintiff did not prove that a single search query ever has fetched any of (i) Plaintiff's Composite, (ii) Defendant's Composite (or its Replacement), (iii) Plaintiff's Symbol, and/or (iv) the symbol portion of Defendant's Composite (or its Replacement) — whether separately or together or in any combination.  No credible evidence showed even that the service names have appeared alongside each other.

30.    In sum, there is no credible evidence that the service marks at issue ever have appeared side by side on the same online "shelf," nor any credible evidence that one service mark has appeared where the other would have been expected.

31.    *Artificial Intelligence*:  At trial, responding to the district judge's questions about the evidence concerning web searches, plaintiff's counsel argued (as counsel, not as witness): "Your honor, Google is dead" (Tr. 360).  Plaintiff's counsel, Attorney Abhyanker, for the first time ever offered a theory of how search queries posed to artificial intelligence chatbots, like ChatGPT or Perplexity, might be returned with confusing results (*see* Dkt. No. 323).

32.    No admissible evidence was ever presented that supported such theories.  At trial, for example, Attorney Abhyanker asked defendant's survey expert about such possibilities; defendant's expert was not qualified to answer.  And, Mr. Abhyanker's own thoughts on these

United States District Court
Northern District of California

topics shared from the witness stand were not cogent or credible, either.  In a brief submitted midtrial on "AI recommendation system[s]" and "paradigm[s] of consumer perception" (*id.* ¶ 25), Attorney Abhyanker cited to online tech blogs, online data about AI "use cases," and other such sources; no judicial notice was requested, and it would have been denied.  The only actual trial evidence *cited* by the brief were three snippets of deposition statements that had been read into the record, but which were not statements concerning A.I.-mediated confusion at all (*see id.* at nn.19–20, 22).  (The brief itself was not evidence (Tr. 458).)

33.    *Web Browsers*:  Both defendant and plaintiff have used websites that display their respective marks.  No one has ever typed into their web browser a web address involving a service name associated with plaintiff, as in www.legalforce.com, only to arrive by mistake at defendant's website displaying the accused mark, www.lawfirms.com.  And, no credible evidence proved that anything about the websites themselves was confusing.  Defendant has done no "cybersquatting" to somehow make defendant's website more proximate to plaintiff's website or more confounding to its customers on the worldwide web.

34.    *Social Media*:  Both defendant and plaintiff have used the service marks at issue in social media, but not on the same social media platforms.

35.    For its part, plaintiff has used Plaintiff's Symbol on the professional networking site LinkedIn to designate its corporate profile and its employees' place of employment. (Specifically, it has placed a version of this symbol above the stylized words "**Legal**Force" as one compact logo — in other words, arranging the parts of Plaintiff's Composite but vertically not horizontally.)  There was no evidence that *defendant* has used the symbol portion of or the entirety of Defendant's Composite on LinkedIn.  Nor was there evidence defendant would use such marks on LinkedIn, even descriptively.  "LawFirms.com," unlike LegalForce, does not target businesspeople.  It is not the service name of a standalone business with its own employees.

36.    Defendant, for its part, has instead marketed to individuals on the social media sites Instagram, Facebook, and TikTok using Defendant's Composite.  There is no credible evidence that *plaintiff* has marketed on Instagram, Facebook, or TikTok using Plaintiff's

Composite (or Symbol), or would.  At trial, defense counsel specifically asked plaintiff's witnesses for testimony or other evidence that LegalForce had placed an ad on Instagram using its marks.  No credible testimony nor any documentary evidence ever proved it had done so.

37.    *Conferences and Physical Locations*:  Prior to this litigation, plaintiff had not used its service marks at any conference.  And, since its predecessor entity closed a retail location more than a decade ago, plaintiff has not used anything like its service marks at any physical office for marketing to new customers.  There is no evidence defendant has used Defendant's Composite (or Replacement) in any conference or physical location whatsoever. There is no credible evidence defendant ever would.

\*          \*          \*

38.    Simply put, there is no proof that consumers have ever seen or will ever see the service marks at issue in the same marketing channel — not side-by-side, not serially (such as after a Google search for one instead returns the other), not in any way.  LegalForce and LawFirms.com are not marketed in the same places in part because they do not offer the same services.

### (iii)    *Not the Same Services.*

39.    Defendant and plaintiff have not offered the same services and usually not to the same people.  At the highest level of generality, of course, both businesses have made money by helping solve legal problems for people.

40.    *Defendant* is not a law firm, nor would it appear to be a law firm to those who use it.  Instead, it has run several websites to generate referrals to third-party law firms and lawyers.  Its website www.lawfirms.com always has presented a webform for people to fill out, and before this litigation also presented legal blogs and links to one of its directory websites. Defendant's directory websites, like www.avvo.com, have listed lawyers for people to browse. Referrals from www.lawfirms.com and other properties of defendant sometimes have been provided for purchase or subscription to lawyers on the directory sites like www.avvo.com.  Of defendant's websites, only www.lawfirms.com has used or would use the accused marks.

9

United States District Court
Northern District of California

There was no evidence that prospective lawyers buying those referrals would see the accused mark.

41.    True, www.avvo.com has listed some trademark lawyers.  But www.lawfirms.com almost always has attracted and referred individuals having personal problems.  These include personal injuries (like from car accidents), employment issues (worker's compensation), and family matters (divorce).  The website far less frequently and without targeting has attracted and referred individual business owners having business problems, such as with intellectual property.  It has presented all comers with a general webform.  Some (very few) who have completed the form have indicated in it that they had trademark needs.

42.    These leads have been stored in a large leads database — the so-called Nolo database — together with leads from at least one of defendant's other sites.  Each lead has been labeled by its originating site.  Many have been distributed to lawyers.  The revenue for each personal injury lead has been about $85.  The revenue for each trademark lead has been about $46.

43.    For all periods placed at issue by plaintiff, www.lawfirms.com in total collected and distributed fewer than 25 trademark leads to trademark lawyers, representing less than $1,000 in revenues.  This was a small fraction of all leads and revenue generated by www.lawfirms.com for those periods.  For the specific November 2023 to July 2024 period when www.lawfirms.com used the accused mark, zero trademark leads and indeed zero intellectual property leads of any kind were even collected.

44.    *Plaintiff*, by contrast, runs a law firm specializing in trademarks and intellectual property as well as several websites to attract businesspeople having such needs to its own law firm.  Plaintiff has never provided legal services for personal injury, employment issues, or family law.  Nor has plaintiff ever received any appreciable number of inquiries from any persons seeking any such services.  Plaintiff has never systematically made referrals of any kind to any other lawyers or law firms.

45.    In sum, the overlap has been virtually non-existent.  Yes, a small part of defendant's business has involved referring people to trademark lawyers but even there an important difference exists between a referral service that sells leads to law firms versus a law firm providing legal services.

### (iv)    No Likelihood of Expansion.

46.    Again, plaintiff has not served a broader array of legal needs nor referred people with legal needs to lawyers — but plaintiff now states an intent to do both.

47.    Such supposed intent is rejected as false.  Plaintiff has had more than a decade to broaden its legal practice and/or to begin making referrals systematically to other lawyers and it has failed to do either.  The supposed new plans are a fanciful gimmick invented solely for trial purposes.

48.    Plaintiff's chief executive officer, Mr. Abhyanker, for instance, testified in vague terms that plaintiff already had provided pathways for small business owners to communicate with one another about the various problems they faced and to connect with other lawyers to take on their wide-ranging problems.  None of this testimony contained factual specifics.  None was supported by other evidence.  None was delivered by a credible witness.

49.    Nor does defendant, for its part, have any intent to expand into generating appreciable numbers of referrals to trademark or intellectual property lawyers using Defendant's Composite.  Defendant has generated precious few leads for intellectual property lawyers through www.lawfirms.com.  This was true before www.lawfirms.com began using Defendant's Composite, and it remained true after the site began using Defendant's Composite (and Replacement).

### (v)    Not Careless Customers.

50.    People seeking referral to a trademark or intellectual property lawyer exercise moderate care.  They are more mentally alert than someone grabbing a lemon-lime soda.  They would not be likely to confuse the two marks even if the marks were seen side by side.

51.    The evidence on care came primarily from three sources.  *First*, plaintiff elicited through examination of defense witnesses that defendant's lawyer directory on www.avvo.com

United States District Court
Northern District of California

(not www.lawfirms.com) included listings for trademark lawyers.  This provided circumstantial evidence that persons seeking trademark lawyers find it useful to look up information about multiple lawyers or law firms before settling on one.  *Second*, one of plaintiff's experts testified that while consumers of legal services tend to be sophisticated and take great care, plaintiff has offered relatively less expensive trademark registration services, suggesting but expressly not concluding that they may be relatively less sophisticated and take relatively less care (Tr. 338–39).  Relatively less care is not no care — especially if being compared to the care taken for more expensive legal services.  *Third*, plaintiff read in deposition testimony from defendant's employee that a trademark lead commands about half the price of a personal injury lead, at about \$46 compared to about \$80 to \$90.  Protecting a business's reputation is important, even if it is on average more important be made whole after the kind of bodily injury that prompts a person to seek a lawyer.

52.    In sum, plaintiff did not prove that its current customers exercise low care, much less prove that its future customers would exercise low care if it were to expand to compete with defendant's broader array of referral services for a broader set of legal problems. Customers seeking lawyers exercise at least moderate care.

### (vi)    Not a Strong Senior Mark.

53.    Plaintiff's Composite has been deemed incontestable, while Plaintiff's Symbol has not.  Other factual evidence is as follows:

54.    *Commercially*, plaintiff has used Plaintiff's Composite and Plaintiff's Symbol in its business but barely so.

55.    Plaintiff's marketing efforts usually have involved the service name and service marks for "Trademarkia."  Far less frequently and less prominently, plaintiff has used the service name and service marks for "LegalForce."  On plaintiff's own websites, the service marks for "Trademarkia" have appeared in the header for www.trademarkia.com as well as in the header for www.legalforce.com — in the latter case coupled up with Plaintiff's Composite. Plaintiff's Composite has not appeared in the header for www.trademarkia.com, only in its footer.  And, on third-party websites or otherwise, plaintiff's service marks have appeared only

*unpaid*, if at all.  At trial, defense counsel repeatedly asked witnesses for any evidence of any paid advertisement using plaintiff's "LegalForce" service name or marks and no credible testimony or documentary evidence of such was ever produced at trial.  Only a tiny fraction of plaintiff's marketing budget can be deemed to have promoted the "LegalForce" service marks at issue here.

56.    Plaintiff's "Trademarkia" service name and marks have become known among those who regularly deal in trademarks.  Plaintiff's "LegalForce" service name and marks have not become well known even among the ones who know "Trademarkia."  Plaintiff did not even prove that its own law firm clients know the name "LegalForce."  Emails among the lawyers from plaintiff's law firm representing plaintiff in this case sometimes used the service mark for "Trademarkia," not for "LegalForce."

57.    Again:  The marks for "Trademarkia" and for "LegalForce" are readily distinguishable.  Consumers did not, do not, and will never consider them to be one and the same mark or even variations of one another.

58.    *Conceptually*, Plaintiff's Symbol and Composite comprise common features arranged in a common way, with limited distinctions.

59.    Plaintiff's Symbol disclaimed color so was not distinguished by color.  And its general shape — a squat parallelogram with some rounded corners and some unrounded ones — was shared by other marks in commerce.  Twin arches it is not.

60.    Plaintiff's Composite is its symbol confined to an orange color and complemented by a stylized word.  As for the symbol portion, there were many other orange parallelograms already in use.  The gradient applied (from lighter to darker) added a slight distinction.  As for the stylized word portion, the words were chosen to describe the legal force protecting the client.  The first word was styled in bold ("**Legal**"), the second in plain text ("Force"), and both first letters were capitalized.  Bolding one but not both words distinguished the stylings from other marks somewhat.  As for the overall arrangement in a "horizontal stack" with the symbol on the left and the word on the right, this choice was not arbitrary.  It was a common and functional choice to fit well at the top of a website.  And, when that overall arrangement was

13

not as functional for a situation, another functional arrangement was used instead: For example, the symbol was placed above the word in a compact "vertical stack" for use on plaintiff's chief executive's LinkedIn profile. The horizontal arrangement at issue was thus not a distinct or sole choice itself associated with the mark's source. One of plaintiff's experts opined that the mark taken as a whole was "conceptually on the weaker end" (Tr. 336), and this order agrees.

61.    In sum, Plaintiff's Symbol and Plaintiff's Composite lack commercial and conceptual strength.

### *(vii)    No Intent to Confuse in Selecting Junior Mark.*

62.    Defendant did not select defendant's mark because of plaintiff's marks. Defendant had no reason to ride plaintiff's coattails, nor even to step on them: Plaintiff's marks were not well known. Plaintiff and Defendant were not proximate or expanding.

63.    Defendant witnesses explained how its mark was selected and it had nothing to do with plaintiff's marks or plaintiff whatsoever. As for the symbol portion, defendant chose a squat parallelogram because it presented well on websites in conjunction with words. Defendant chose to place a column inside it because a column conventionally suggested courts and the lawyers who appear in them. Defendant chose "**LawFirms**.com" because its online website with that domain referred people to law firms. Defendant chose its colors, fonts, and stylings for its www.lawfirms.com logo to complement one of its existing logos — one reason being that employees discussed displaying its new logo with the phrase "powered by" plus its existing logo for Avvo — and so chose an orange for its new logo to complement the blue of the existing logo (designers treat those colors as complementary). Defendant then chose the sizing and stacking of all these components, which again matched its existing logos, so that its mark could be configured to appear clearly at the top of its website.

64.    The worst that could be said was that defendant neglected to do a trademark search before settling on a mark that assembled common elements in a common way. Defendant's design manager had not heard of LegalForce before this action, and she saw its marks for the first time only after our first hearing prompted defendant to redesign its mark to

14

avoid plaintiff's marks further, this undertaken the week after our first hearing. The failure to conduct a trademark search before selecting the original mark did not result from bad faith. A trademark search was not required by law.

### (viii)    Not Similar Marks.

65.    Although some similarities would be appreciated if Plaintiff's Composite and Defendant's Composite were ever compared in commerce (they were and are not, as above), the differences between the marks would still stand out. Purchasers of legal services would not be so cavalier as to overlook these differences. The composites are compared here part to part, then whole to whole.

66.    As for the symbol portions, the senior mark has an "L$^F$",  while the junior mark has a Roman column, and each of these is placed in front of a squat parallelogram. *At sight*, the "L$^F$" does not have the same outline as the column. And, *in meaning*, the initials "L$^F$" do not suggest the same thing as the Roman column. The background shapes, for their part, are similar in outline to one another but also to those of other icons. And, these shapes are filled somewhat differently: The one in Plaintiff's Composite uses orange with a gradient (from lighter to darker), while the one in Defendant's Composite uses orange without any gradient (one flat shade). These shapes do not communicate anything beyond what each frames, the "L$^F$" or the column. (If taken alone, Plaintiff's Symbol did not claim color.)

67.    As for the word portions, the senior mark bears "**Legal**Force" while the junior mark bears "**LawFirms**.com." *At sight*, yes, each set of letters includes the capitalized letters L and F. Still, these letters spell different words. And, yes, each mark's lettering has an initial group bolded and a latter group not. Still, the senior mark bolds only the first word, "**Legal**," but not the second, "Force," while the junior mark bolds both words "**LawFirms.**" *In meaning*, the senior mark describes *one* legal force, while the junior mark uses the generic term for many or *all* law firms. That meaning relates to one being one law firm and the other being a referral service to many law firms. Again, the words "Law" and "Firms" do not appear anywhere in "LegalForce," and the words "Legal" and "Force" do not appear anywhere in "LawFirms." *If heard* (or read), these different words do not sound the same.

68.     As for the combined whole, the composites at issue are arranged in a so-called horizontal stack, as set out above.  The arrangement is a common, functional choice for combining symbols and words into a mark that can be displayed at the top of a web page.  No credible evidence proved that when viewing the marks as a whole this horizontal stacking itself was important to any consumer impression or to any association with any service.  Again, LegalForce sometimes used a vertical stack.  The impression from such marks was instead formed mainly by glomming onto one part and then the other part, regardless of such parts' arrangement.  Although the marks had some similarities, they were not close to identical — and in fact the differences stood out in the overall consumer impression.

69.     At trial, plaintiff's evidence of similarity leading to confusion included testimony respecting a survey conducted by plaintiff wherein respondents were shown head-to-head comparisons of the composites and posed with this scenario:  "If you saw the logos [below] on two different websites [whe]n searching for law firms, would you think they are connected, affiliated, or associated in any way?" (Oct. 7 Tr. 90).  The percentage answering "Yes," we eventually learned, was 13 percent.

70.     On direct, plaintiff's Expert Michael Lawrence Rodenbaugh initially testified that the "percentage [who] believed that the two businesses were connected, affiliated, or associated" was "32 percent" (Oct. 7 Tr. 30).  On cross, he repeated that testimony before conceding that there were in fact three answers — "No," "Maybe," and "Yes" — and that he had lumped the "Maybe" (19 percent) with the "Yes" (13 percent).  He also watered down the previous description of his 32 percent number from those who "believed that the two businesses were connected" to those who "d[id]n't know one way or the other" under the scenario (Oct. 7 Tr. 91–92).  This is emblematic of the lack of credibility of plaintiff's case.  More will be said about that below.  For the moment, the shortcomings of this question and answer deserve further comment.

71.     The survey question posed a scenario that was not specific and that did not reflect any scenario proven to exist or to be likely to exist in commerce.  It asked what the respondent would think "[i]f you saw the logos [below] on two different websites [whe]n searching for

16

law firms." It *did not* pose what specific search or search process would ever lead to the two (no web search or even consumer search process leading to both was proven to have existed or to be likely, as the sites targeted different people needing different things). It *did not* pose what specific formatting or stated offerings each website would share (no such similarities across the websites were proven up). It *did*, however, show the two composite marks head-to-head (even as no head-to-head comparison was proven to have existed or even be likely). So, in response to the broad scenario posed, it was reasonable for some respondents to answer "Maybe": Maybe they would think the websites were associated, depending on the specifics. Given the specifics of how the marks have existed or are likely to exist in commerce, however, it was unreasonable to assume that every "Maybe" in the imagined scenario would remain a "Yes" in any real one. Of course, there were even more significant methodological pitfalls, set out further below.

72.     In a separate question, plaintiff's survey showed respondents a head-to-head comparison of Plaintiff's Symbol versus the symbol portion of Defendant's Composite, then asked the same question above. On direct, plaintiff's Expert Rodenbaugh said the percentage of those who "would [ ] think [websites bearing the symbols are] connected, affiliated[,] or associated" was "26 percent" (Oct. 7 Tr. 30). On cross, it came out that those in fact answering "Yes" was under 10 percent (Oct. 7 Tr. 92). The same problems above apply again here. Indeed, as for this scenario, it was not even proven that the symbol portion of Defendant's Composite ever has appeared or would apart from Defendant's Composite.

73.     Defendant's more methodologically robust survey showed that the bottom-line number for those likely to be confused was *zero* percent (Tr. 416). The survey did not show the junior mark and senior mark together; indeed, it did not show the senior mark at all. Instead, it showed consumers the junior mark on a copy of www.lawfirms.com, then relied on them to answer if they believed the www.lawfirms.com services were put out by, affiliated with, or approved by some other business, whose marks or name they might recall and then write in. No one responded with LegalForce, Trademarkia, Raj Abhyanker, or anything similar. This survey was run with likely consumers of plaintiff's services and with likely

consumers of defendant's services.  The answer was zero for either cohort.  Because there was

no credible evidence that the two companies' marks have appeared or would ever appear in

proximity, and because LegalForce had no credible plans to increase the use or even awareness

of its marks, this approach in some ways better fit how the junior mark has made or would ever

make an impression on a consumer and how, if at all, that impression would be confused with

the senior mark.  The defense survey and defendant's expert witness were far more credible

than plaintiff's, as further set out below.

74.    The marks have some similarities but also differences that stand out to consumers

of legal services even if both are proximately compared.  And, because plaintiff failed to prove

that any mark at issue has broad recognition or has appeared proximate to another mark at

issue, or that these circumstances are ever likely to change, the possibility of confusion

between the marks is essentially zero for that reason also.

**4.    FURTHER FINDINGS RELATED TO CREDIBILITY AND WEIGHT.**

> **A.    *CONFUSION SURVEYS AND EXPERT WITNESSES.***

75.    Plaintiff law firm designed a consumer confusion survey for the litigation; when it

did not like the results, it tossed that one, then designed another.  Even the new test backfired,

as described above.

76.    The instigator of this effort was plaintiff's chief executive officer and trial

counsel, Raj Abhyanker.  At first, he disclaimed expertise in confusion surveys, after directing

the creation of one (Tr. 183); later, he claimed the entire discipline of confusion surveys was

methodologically broken, after his own creation was taken apart (Dkt. No. 323).  What he

consistently lacked was credibility.  He personally sought to manipulate the survey design and

then to lead his experts down a primrose path towards opining on more than what the survey

could support.  To the extent either expert communicated with plaintiff about the survey as

plaintiff designed and undertook it, those communications were made while ignorant of

relevant, material information that plaintiff withheld.  For instance, plaintiff never informed its

experts that no person seeking trademark lawyers had completed the interest form on

defendant's webpage during the period of alleged infringement.

United States District Court
Northern District of California

77.    One of the major faultlines underlying the construction of plaintiff's survey presented at trial was that it lacked a control.  Some people are easily confused.  So, it is helpful to a factfinder to know whether a portion of respondents in a survey that appear to be confused by the accused mark are of the sort that would also be confused by some innocuous mark (the control).  The other side's survey contained this and other features for reliability.

78.    Plaintiff, too, in fact had run a survey with a control.  That survey had shown there was no unusual amount of confusion at all:  Respondents on average had not been materially more flummoxed by the junior mark than by a control.  Because such a result did not support plaintiff's position, plaintiff's chief executive officer and trial counsel dropped the control and re-ran the survey.  This re-crafted survey was presented to the hired experts and to the Court.  Other methods to reduce bias were known to plaintiff but not followed in the re-crafted survey.

79.    And, even the re-crafted survey asked questions that incorporated false premises, were ambiguously worded, and/or were reported to the Court with at first material omissions.  This point is already well-made by the examples above involving Expert Rodenbaugh.

80.    Expert Rodenbaugh also destroyed his own credibility more broadly.  For instance, he testified that there remained a chance that a person having seen the senior mark at a retail location more than a decade ago might still recall the mark well enough to be confused by seeing the junior mark online today.  Expert Rodenbaugh had no specific foundation nor even specialized experience leading him to believe this could be true.  Instead, he simply testified to the answer plaintiff wanted rather than to the truth.

### B.    PLAINTIFF'S CHIEF EXECUTIVE AND TRIAL COUNSEL.

81.    During this litigation, Raj Abhyanker has made other representations to this district court that proved untrue, when speaking as plaintiff's trial counsel, plaintiff's chief executive officer, or for himself as a percipient witness.

82.    As one example, across these roles, plaintiff law firm (led by Mr. Abhyanker) alleged in its complaint that it had spent at least $10 million advertising and promoting the senior mark; Attorney Abhyanker provided this figure and some receipts respecting it to the

experts for use in their reports; Mr. Abhyanker then testified misleadingly under oath to having spent $10 million advertising the mark. On cross-examination it was revealed that zero of that $10 million had been spent buying ads showing the actual marks at issue. Money was spent buying ads for "Trademarkia." This was not a half truth; this was a no truth.

83. As an example from his role specifically as trial counsel: While cross-examining design manager Neethu Ramchandar, Attorney Abhyanker stopped short, turned, and said the following to the Court: "Your honor, we were deprived of the opportunity to depose Lisa Morita by the special master. We tried, and that's all I have, so I don't have any further questions [for Ms. Ramchandar]" (Tr. 295).

84. The Court followed up to learn about the lost opportunity to depose Ms. Morita, who might have had some role in instructing or selecting the design of the accused mark.

85. Recall plaintiff had been unable to find any evidence of copying. At least three levels of defendant's staff were involved in defendant's design of the composite: The designer (Rahul Vazhayil), the design manager (Ms. Ramchandar), and the chief operating officer (Ms. Morita). *As for the designer*, plaintiff did not present any direct evidence at trial nor complain about any inability to present it. *As for the design manager*, plaintiff took the deposition and trial testimony of Ms. Ramchandar. *As for the chief operating officer*, Ms. Morita, plaintiff blamed the special master for denying a motion to compel her deposition, bringing this lament to the district judge for the first time ever only after plaintiff's counsel had examined Ms. Ramchandar at trial and then stopped abruptly.

86. The following exchange resulted shortly thereafter, which also included defense counsel, Attorney Steven Schuman (Tr. 296–97):

> **[ATTORNEY] SCHUMAN:** I do want to raise something though. [Attorney] Abhyanker keeps making statements like he was denied the ability to take this deposition. I don't remember anything like that happening. I think he exceeded his ten -- or he met his ten deposition limit but I don't recall anything about Lisa Morita. I can't swear there wasn't, but I just don't like him making a record which is often just sort of made up.
>
> **[ATTORNEY] ABHYANKER:** You know, this is so silly. *The documents in the records speak for itself. This man lies regularly so I can, you know –*

20

**THE COURT:** Now I'm looking skyward to the Court of Appeals. This is what I'm up against, Honorable Judges. One side says, yes, X; the other side said not X[;] they have no proof.

**[ATTORNEY] ABHYANKER:** I have proof.

87.    So, the Court provided time for Attorney Abhyanker to find the record of the special master's decision. After the next break and well before the deadline given for submitting this record, Attorney Abhyanker reported he had found his motion to compel at Docket No. 57. This exchange resulted regarding the decision (Tr. 306):

**THE COURT:** What was the reason [the special master] gave for not letting you do it?

**[ATTORNEY] ABHYANKER:** I will have to review the record but we were --

**THE COURT:** Well, maybe there was a very good reason.

The Court indicated it was unhelpful that Attorney Abhyanker had looked up his motion but not the special master's corresponding order, and said: "He's a very fair person . . . if he said no, I'm going to trust him" (Tr. 306). Then, Attorney Abhyanker changed his position (*ibid.*):

**[ATTORNEY] ABHYANKER:** I remember now, Your Honor.

**THE COURT:** But you can't even tell me what his ruling was.

**[ATTORNEY] ABHYANKER:** I do. It was based on their opposition that he's [*sic*] -- apex doctrine. They're so high up in the company, go depose all of these other people. We tried. And we couldn't get anything from them and we were not able to get it from Morita. And this would have all been prevented -- they say we had nine depositions -- we tried to get Morita from the start.

**THE COURT:** I don't believe much of what you say anymore. You've exaggerated and are argumentative. Maybe there's a kernel of truth in it, I don't know, but you don't -- if you're going to make this argument to the Court of Appeals, back it up with paper.

**[ATTORNEY] ABHYANKER:** We will.

88.    During the break, the district court for itself looked up the motion, at Docket No. 57, and the corresponding order of the special master, at Docket No. 66. As it turned out, Attorney Abhyanker had presented yet another falsehood (Tr. 372–73):

21

THE COURT:  I want to put on the record something I looked up when we were on a break earlier today.  [Attorney] Abhyanker complained about not having been able to take the deposition of someone named Lisa Morita and had said the special master had denied the request.  And he referred specifically to document 57 as the thing we should go look at so we did. . . .  [I]t's true that he made a motion to compel three people, including Lisa Morita.  But here is the order by Special Master McElhinney which contradicts what [Attorney] Abhyanker said.  I'll quote from the first page [of document 66].

["]The first section of plaintiff's motion concerned an effort to compel deposition testimony from three deponents.["]

And if you go back and look at number 57, that included Lisa Morita.  Continuing,

["]LegalForce withdrew that portion of its motion after opposition had been filed when it became clear that no notices or subpoenas had been served in connection with the deposition.["]

So the motion was not denied.  The motion was withdrawn on account of failure to give notice or subpoenas.  That's what this document says.

So I hope when this case goes up to the Court of Appeals, the Court of Appeals will have the ability to take with a grain of salt the things that counsel is saying in this case and at least check it against the record, as we did here.  Now you referred to [document] 57, that's what I did, and it does not support your position.[*]

### 5.    FURTHER FINDINGS RELATED TO EXHAUSTIVENESS OF DISCOVERY.

89.    Discovery was egregiously litigious.  It was marked by failures by counsel on both sides.

90.    Emblematic of the entire ordeal, plaintiff's first motion to compel was filed the night before our initial case management conference and contained over 335 pages of exhibits, violating the Court's standing order (*see* Dkt. No. 40).  Then, the next morning, at the initial case management conference, defense counsel failed to appear, prompting an order to show cause (*see* Dkt. No. 41).

---

[*]    Days later, plaintiff's counsel filed a 123-page submission changing its position on the Ms. Morita deposition yet again (Dkt. No. 326).  When the Court issued an order explaining why that submission was not evidence at trial (Dkt. No. 329), plaintiff without leave added a further 11-page submission that changed its position in subtle ways once more (Dkt. No. 330).  For avoidance of doubt, that was not trial evidence, either, and is STRUCK from the trial record.

United States District Court
Northern District of California

United States District Court
Northern District of California

91.     Anticipating such problems would compound on both sides, the district judge requested that the parties stipulate to the appointment of a special master for discovery to oversee their disputes at their own expense (*see* Dkt. No. 42); they agreed (Dkt. No. 55). Special Master Harold McElhinny was for decades prior to recent retirement a premier trial and intellectual property lawyer at Morrison & Foerster LLP. He agreed to serve at a rate of only $300 per hour as a service to the district court.

92.     After Attorney Abhyanker's first four discovery motions had been denied, denied in part, or withdrawn, it was now Attorney Abhyanker's turn to oppose a motion to compel — which he lost in part. Special Master McElhinny ordered as follows (Dkt. No. 88 at 1–2):

> Defendant served a Request For Production of Documents on September 19, 2024. . . . Plaintiff made no attempt to comply with the Local Rules that govern this case. It did not identify what files, if any, were searched. It did not supply a privilege log. As of today, [more than a month after start of discovery,] Plaintiff has yet to produce a single document. Plaintiff did not comply with Rule 34(b)(2)(C) which requires it to identify documents in its possession that it is withholding from production because of a stated objection.

> Frankly, it is difficult to believe that Plaintiff's responses were produced in good faith. How can it be that not one document request sought relevant documents? While it is possible that every request was overbroad, that seems unlikely. Can we be this far into litigation and the Plaintiff, who presumably complied with its obligations under Rule 11, F.R.C.P., before filing the Complaint has not produced a single document either as part of its Initial Disclosures or through discovery? I don't think so.

93.     Defendant, for its part, also prolonged productions and responses on important points even when it later came out that those productions and responses tended to support defendant. Most importantly, defendant delayed and delayed and delayed disclosing that its lead-generation website at issue, www.lawfirms.com, had not generated relevant intellectual property-related leads during the alleged infringement period.

94.     Even after receiving discovery that showed virtually no damages would be recoverable in this action, plaintiff thereafter submitted eight more discovery filings. One of those eight before the special master sought an adverse inference at trial (Dkt. No. 172). As it turned out, the documents at issue in that motion, which plaintiff believed defendant still to be

withholding, in fact had been sitting in plaintiff's mailroom (Dkt. No. 190). Later, plaintiff represented to the Court that it wished to dismiss the action after those eight discovery battles because of what it had learned before them, if defendant would be barred from attorney's fees.

95.    Such incompetence and malevolence on both sides led to *forty* discovery orders, many of them omnibus orders, filed by Special Master McElhinny. As Special Master McElhinny described the proceedings when partway through (Dkt. No. 139 at 1–2):

> This is a routine trademark infringement action filed in Federal Court because of the nature of the legal issues, not because of the size of the damages sought. To date, no novel legal issue has arisen. Unfortunately, the case has required a significant amount of judicial oversight because of the toxic relationship among counsel, a repeated lack of professionalism and courtesy on the part of both parties, and a repeated failure to understand or to follow the local rules that apply to the case. Relying on his many years of experience, the District Judge foresaw from the earliest filings the problems that were likely to arise. Recognizing that it would be unfair to saddle a busy District or Magistrate Judge with the effort of overseeing these dystopian personality issues, the Judge directed the parties to the undersigned. Despite my best efforts and constant encouragement, the case has unfolded as the Judge foresaw. Getting the parties to meet and confer has been a monumental task. Over a quarter of my decisions have had to resolve complaints that one party or the other has failed to meet and confer. Counsel repeatedly accuse each other of lying. Counsel hang up on each other in the middle of calls. Counsel repeatedly copy me on performative emails, despite my repeated assurances that doing so cannot influence the outcome of my decisions.

"Most lawyers would [have] die[d] in shame" (Dkt. No. 147). We went to trial.

96.    Special Master McElhinny managed the issues arising between these parties with great skill and aplomb. He ably served the United States District Court for the Northern District of California in this discovery-intensive proceeding, and is duly thanked.

97.    The immediate relevance of these findings is that no party here lacked robust opportunity to seek and obtain discovery. Discovery was more fraught and prolonged than it should have been — but discovery ultimately was obtained on both sides to the extent there was anything to discover. It is the judgment of the district judge that the failure to find supporting facts on one side or the other simply reflected that those facts did not exist.

## CONCLUSIONS OF LAW

**1.    TRADEMARK INFRINGEMENT UNDER THE LANHAM ACT.**

98.    To prove infringement, plaintiff must establish (i) ownership of a valid registered mark "in connection with the sale, offering for sale, distribution, or advertising of any goods or services," (ii) another's use of a mark "likely to cause confusion, or to cause mistake, or to deceive" in connection with the sale of goods or services, and (iii) entitlement to any damages or injunctive relief. *See* 15 U.S.C. § 1114(1)(a) & (b); *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005). Trademark validity and infringement involve mixed questions of fact and law. Because this was a bench trial, the district judge made both kinds of findings.

### *A.    PLAINTIFF'S COMPOSITE.*

#### *(i)    Rights of Senior Mark:  Valid, Owned, and Entitled to Exclusive Use in Market?*

99.    A trademark is protectable by its owner for uses for which the mark serves to "identify the source of the [service] rather than the [type of service] itself." *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.,* 456 U.S. 844, 851, n. 11 (1982). To establish such facts, a court shall rebuttably presume certain facts as stated in the trademark's registration:

> A certificate of registration of a mark upon the principal register provided by this chapter *shall* be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate.

15 U.S.C. § 1057(b) (emphasis added). Furthermore, "[t]o the extent that the right to use the registered mark has become incontestable under [S]ection 1065 of this title, the registration shall be conclusive evidence" of validity, ownership, and right to exclusive use — subjecting the presumptions only to narrowed rebuttals. *Id.* § 1115(b); *Casual Corner Assocs. v. Casual Stores of Nevada, Inc.,* 493 F.2d 709, 711–12 (9th Cir. 1974); *see also Metro Pub., Ltd. v. San Jose Mercury News*, 987 F.2d 637, 641 n.3 (9th Cir. 1993).

United States District Court
Northern District of California

100.    Here, defendant concedes that Plaintiff's Composite is valid, owned by plaintiff, and available for its exclusive use for the services at issue — so long as the Court finds the copy of the registration provisionally admitted to be a genuine one.  Notably, defense counsel earlier represented to the Court that its client already had the certified copies, but defense counsel has never pointed to any specific reason to doubt the reliability of the copies provided by plaintiff.  So, neither side made these points as simple as they should have been.

101.    A non-certified copy of a registration may be admitted if supported by foundation. *Roar Spirits, LLC v. Sutter Home Winery, Inc.*, No. 23-CV-04809-HSG, 2025 WL 523898, at *4 (N.D. Cal. Feb. 18, 2025) (Judge Haywood S. Gilliam, Jr.) (citing decisions including *Autodesk, Inc. v. Dassault Sys. SolidWorks Corp.*, No. C 08-04397 WHA, 2008 WL 6742224, at *2 n.1 (N.D. Cal. Dec. 18, 2008)).  Here, plaintiff sought to move into evidence a non-certified copy.  Plaintiff laid foundation as to how this copy had been printed from the U.S. Patent and Trademark Office's online portal.  It was provisionally admitted.  After close of evidence, plaintiff renewed its motion (Dkt. No. 337).  Defendant still did not point to any specific reason to doubt the printout's reliability (Dkt. No. 338).  Then, in reply, plaintiff produced the certified copy itself (Dkt. No. 346).  This certified copy did not deviate in substance from what was represented on the printout — showing the mark, its ownership by plaintiff, its exclusive uses, and its renewal under Sections 8 and 15 (including as incontestable).  The certified copy is self-authenticating.  *See Metro Pub.*, 987 F.2d at 641 n.3. For avoidance of doubt, both copies are **ADMITTED** into evidence.

102.    Because defendant has not pointed to any of the limited statutory bases for rebutting an incontestable mark on these points, the mark is valid, owned by plaintiff, and exclusively available for its use in the services at issue here.

### (ii)    Infringed by Junior Mark:  Used and Likely to Confuse?

103.    At the threshold, "trademark infringement claims require that the defendant use the [accused] mark 'in connection with' goods or services."  *LegalForce RAPC Worldwide, PC v. LegalForce, Inc.*, 124 F.4th 1122, 1125 (9th Cir. 2024) (quoting Lanham Act).

United States District Court
Northern District of California

United States District Court
Northern District of California

Defendant here concedes that it collected information from clients seeking referrals to lawyers using Defendant's Composite. Defendant argues, however, that this use was not "in connection with" any service because the clients did not pay for referrals, the lawyers did. That is of no moment to this requirement. Defendant could have charged the clients instead. A similar choice is available to the many businesses, from print newspapers to online platforms, able to sell either subscriptions to end users or else ad placements to partnering businesses. Nothing in the Lanham Act — which requires use at least "in connection with" selling a service — supports the concept that a defendant can launder its liability for confusing consumers into using its service by charging not its confused customers but its business partners who also benefit from the confusion. *See also Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1057 (9th Cir. 1999). This issue is furthermore beside the point because there is no likely confusion here.

104. "The core element of trademark infringement is the likelihood of confusion . . . ." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992). "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *M2 Software, Inc., v. Madacy Ent., Corp.*, 421 F.3d 1073, 1080 (9th Cir. 2005) (quotation and alteration omitted). Eight "*Sleekcraft*" factors guide the determination:

> (a) strength of [plaintiff's] mark; (b) proximity[/relatedness] of [plaintiff's and defendant's] goods; (c) similarity of the marks; (d) evidence of actual confusion; (e) marketing channels used; (f) type of goods and the degree of care likely to be exercised by the purchaser; (g) defendant's intent in selecting [its] mark; and (h) likelihood of expansion of the product lines.

*Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008) (numbering replaced with lettering) (citing *Sleekcraft*, 599 F.2d at 348–49). A court need not consider every listed factor — and can consider unlisted ones. A court must, however, consider some subset of factors that caselaw and common sense suggest are critical under the circumstances. *Ibid.*

105. Here, the factual underpinnings of every *Sleekcraft* factor point against plaintiff, as above. *There was no confusion.* Plaintiff conceded as much. Nor was confusion likely:

*The senior mark was weak.*  Plaintiff's Composite was on the "conceptually weaker end" and a commercial waif:  Plaintiff purchased no advertisements displaying it.  Plaintiff promoted "Trademarkia" instead, while recognition of "Trademarkia" did not translate into recognition of "LegalForce."  There was no credible evidence that anyone not involved in this litigation could even recall Plaintiff's Composite.  *The marks were not similar.*  Yes, Plaintiff's Composite and Defendant's Composite each arranged a squat parallelogram alongside a two-worded description related to law.  But the arrangement was itself a functional commonplace, there were differences in the symbols ("L$^F$" versus column, with a gradient of color versus one flat shade), there were differences in the words (bolding one versus two words, while describing one legal team versus a service reaching all law firms) — and the differences stood out.  *The marks have not appeared in the same specific marketing channels.*  No web search retrieved both.  And, while plaintiff's mark was on LinkedIn but not Instagram, defendant's mark was on Instagram but not LinkedIn.  There was no credible evidence that the senior and junior mark *ever* appeared head-to-head or serially in the same channel or likely would.  *The services were not related.*  Yes, both parties' services relate to law, at the highest level of generality.  But providing legal services as a law firm is not the same as selling leads to many law firms as a referral service — not in fact, nor as it appears to those using each.  Plaintiff's www.legalforce.com law firm mainly served individual businesspeople with trademark issues.  Defendant's www.lawfirms.com referral service mainly served individual people looking to find and compare lawyers to help with a personal need such as after an accident.  Yes, there was some overlap.  It was incidental, not targeted:  Defendant collected a small number of leads for trademark lawyers during all periods plaintiff put at issue, and zero during the period using the accused mark.  *Nor will there be any expansion.*  Plaintiff has had years to expand.  Its newfound plan to do so is a litigation gimmick.  *People seeking lawyers are not careless.*  Moreover, *there was no intent to confuse.*  Defendant had no reason to do so.  Plaintiff was not well known, the two did not overlap much in what they offered, and neither was likely to change much.

United States District Court
Northern District of California

United States District Court
Northern District of California

106.    No matter how these factors are combined or weighed, they come out against plaintiff.  So, nothing changes if we focus upon the so-called "troika" of *Sleekcraft* factors sometimes exclusively considered — the similarity of the marks, similarity of the services, and similarity of the marketing channels.  *See Brookfield Commc'ns*, 174 F.3d at 1054; *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1148–49 (9th Cir. 2011); *see also Sleekcraft*, 599 F.2d at 348.  Likewise, nothing changes in end result if we stress any subsets of factors most salient to *initial interest confusion* (diverting potential buyers even if those buyers are no longer confused at point of sale), *forward confusion* (stealing another's reputation), *reverse confusion* (displacing another's reputation or ability to accrue one), or *post-sale confusion* (duping other future buyers of services when they look at the services procured by a prior buyer who was not confused).  Whether or not all were pleaded, none was proven.

107.    Nor is it any barrier to a conclusion of non-infringement that the senior mark is incontestable.  Yes, a mark that is incontestable is valid and entitled to exclusive use in a given market space.  But the same factors considered when establishing a mark's validity may be considered again when evaluating a mark's strength for likelihood of confusion.  And, even if incontestable, a mark that remains conceptually and commercially weak cannot be asserted to exclude from its designated market other trademarks that are unlikely to be confused with it.  *M2 Software*, 421 F.3d at 1081 (quoting *Sleekcraft*, 599 F.2d at 350).

108.    And, while plaintiff's complaint did survive a motion to dismiss on the alleged facts, those facts were not proven to be the actual facts.  Our court of appeals has held that because trademark infringement presents questions of law deeply intertwined with questions of fact, it can be "premature for the district court" to "dismiss [a trademark] complaint" by discounting the alleged facts while imagining some other ones as a matter of law.  *See Trader Joe's Co. v. Trader Joe's United*, 150 F.4th 1040, 1055 (9th Cir. 2025); *see also Marketquest Grp. v. BIC Corp.*, 862 F.3d 927, 935 (9th Cir. 2017) ("[W]e reiterate that 'summary judgment is generally disfavored' in trademark cases, [too,] due to 'the intensely factual nature of trademark disputes." (quoting *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*,

*Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010)).  By the same token, we cannot now discount the actual facts by going back to the alleged ones.

109.    Discovery in this action was vigorous.  Eventually, discovery closed.  We had a four-day bench trial.  Despite scorched-earth discovery, at trial plaintiff frequently lacked any evidence or else provided contrivances.  Plaintiff's witnesses were, for the most part, not credible on anything important.  Plaintiff's trial counsel, chief executive officer, and star witness (all the same person, Raj Abhyankar) made misleading representations throughout the case with a frequency unmatched in the undersigned's more than quarter century on the bench. Defense counsel, too, joined in making molehills into monstrosities.  Still, defendant's evidence and witnesses were more credible, as above.

*              *              *

110.    There is no legal basis to sweep away the findings of fact with some contrary finding of law.  There was and is no likelihood of confusion involving Plaintiff's Composite and Defendant's Composite.  *A fortiori*, there was and is no likelihood of confusion involving Plaintiff's Composite and Defendant's Replacement.

### B.    PLAINTIFF'S SYMBOL.

111.    Plaintiff presented no separate basis to show why Plaintiff's Symbol, if valid, was infringed by any mark used by defendant.  In key respects, plaintiff provided even less evidence as to this mark.  And, what evidence was provided vaporized the case for infringement.  For instance, plaintiff provided no credible evidence that defendant has used or ever would use the *symbol portion of Defendant's Composite* apart from Defendant's Composite.  Meanwhile, Plaintiff's Symbol disclaimed color, so it was less distinct even than the *symbol portion of Plaintiff's Composite*.  This pitted defendant's full composite against plaintiff's weaker symbol.  Recall Defendant's Composite did not infringe Plaintiff's Composite.  Defendant's marks did not infringe Plaintiff's Symbol, either.

United States District Court
Northern District of California

**2.    OTHER CLAIMS.**

112.    Plaintiff proposed no findings of fact or law specific to the remaining claims, and its responses to defendant's proposed findings in these areas were conclusory.

### A.    TRADEMARK INFRINGEMENT UNDER CALIFORNIA LAW.

113.    Likelihood of confusion is an essential element of trademark infringement under California common law.  And, the standards for confusion under that law are not so different from those under the federal law as to demand a different result.  *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1129 n.2 (9th Cir. 1998).  Plaintiff did not prove its claim; plaintiff abandoned its claim.

### B.    FALSE ADVERTISING UNDER THE LANHAM ACT.

114.    Plaintiff never provided a separate theory for false advertising apart from false designation of origin using the marks.  Because there is no likelihood that designating defendant's services using defendant's marks has any "tendency to deceive a substantial segment" of the market, there can be no false advertising, either.  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1110 n.1 (9th Cir. 2000).  Plaintiff also abandoned this claim.

## CONCLUSION

None of plaintiff's marks at issue (Plaintiff's Composite or Plaintiff's Symbol) has been or would be likely to be confused with any portion or the entirety of any of defendant's marks (Defendant's Composite or Defendant's Replacement).

Defendant is entitled to judgment in its favor on all claims.

**IT IS SO ORDERED.**


Dated:  December 18, 2025.


_____

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE