UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEGALFORCE RAPC WORLDWIDE P.C.,<br><br>        Plaintiff,<br><br>    v.<br><br>MH SUB I, LLC,<br><br>        Defendant. | Case No.  24-cv-00669-JSC<br><br>**ORDER ON DEFENDANT'S MOTION FOR FEES AND ON PLAINTIFF'S MOTION TO RETAX COSTS**<br><br>Re: Dkt. Nos. 364, 372 |

Plaintiff, a law firm, accused Defendant, an online referrer to law firms, of infringing two trademarks.  (Dkt. No. 1.)[1]  According to Plaintiff, its marks had become well known because it had spent $10 million promoting them.  (*Id.* ¶ 6.)  Plaintiff further alleged Defendant had confused its would-be clients and demanded $1 million.  (*Id.* ¶ 52; Dkt. No. 1-1 at 1.)  During discovery, Defendant delayed court-ordered productions relevant to proving or disproving the $1 million amount.  (Dkt. No. 146 at 5.)  Nevertheless, Plaintiff increased its monetary demand to $15 million.  (Dkt. No. 364-2 at 3.)  Neither side moved for summary judgment.  At trial, Plaintiff failed to prove its asserted marks were well known; indeed, Plaintiff could not show it had spent even one dollar directly promoting them.  (Dkt. No. 347 ¶¶ 54-56, 82.)  Nor was the accused mark confusing.  (*Id.* ¶ 57.)  Defendant had not referred to anyone even one lead gathered while using the mark and relevant to law firm.  (*Id.* ¶ 43.)  So, Senior District Judge William Alsup entered judgment in favor of Defendant.  (Dkt. No. 348.)

Defendant now moves for attorney's fees.  (Dkt. No. 364.)  And Plaintiff moves to retax costs.  (Dkt. No. 372.)  These motions fall to the undersigned, Judge Alsup having retired.  Upon a

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

fresh record review, each motion is GRANTED IN PART and DENIED IN PART.

<strong>BACKGROUND</strong>

This Order does not supplant the alleged facts as construed by Judge Alsup's order denying Defendant's motion to dismiss, (Dkt. No. 26), nor the facts found at trial, (Dkt. No. 347). The trial findings include a detailed summary of the record, including the factual findings and procedural history. (Dkt. No. 347.) Still, this Order repeats key parts of the record and makes factual findings as necessary to decide the pending motions.

## I. THE BEGINNING: FROM FIRST ALLEGED INFRINGEMENT (NOVEMBER 2023) TO INITIAL CASE MANAGEMENT CONFERENCE (AUGUST 2024)

In November 2023, Defendant began using the accused mark on its website, which refers people with legal problems to lawyers. (Dkt. No. 347 ¶¶ 13-15.) The accused mark consisted of a parallelogram with two rounded corners beside the stylized text "**LawFirms**.com." (*Id.*)

Three months later, Plaintiff, a law firm specializing in trademark law, sued Defendant alleging infringement of two of Plaintiff's service marks. (*Id.* ¶ 18; Dkt. No. 1.) Plaintiff's first asserted mark consisted of a parallelogram with two rounded corners (but not the same corners as Defendant's) beside the stylized text "**Legal**Force" (not the same words as Defendant's); the second was that same parallelogram without the text. (Dkt. No. 347 ¶¶ 7-9, 18; Dkt. No. 1 ¶¶ 13-14, 44.) The complaint described other marks, including "LEGALFORCE" and "LEGALFORCE TRADEMARKIA," but did not allege Defendant infringed them. (Dkt. No. 1 ¶ 1.) Notably, the complaint did not include the "TRADEMARKIA" mark Plaintiff used by itself except in the email listed on the complaint for one of its lawyers appearing in the action. (*Id.*; Dkt. No. 34 at 1.) Plaintiff's owner and chief executive officer, Raj Abhyanker, also served as lead trial counsel in this action.

The Court later determined facts alleged in Plaintiff's complaint did not track the facts known to Plaintiff at the time of complaint filing. For example, the complaint alleged Plaintiff had spent over $10 million promoting the allegedly infringed marks. (Dkt. No. 1 ¶¶ 1, 2, 4, 6.) But nearly all Plaintiff's spending had been directed towards Trademarkia, for which Plaintiff did not allege infringement. (Dkt. No. 347 ¶¶ 54-55, 82.) And promoting Trademarkia did little to

2

promote LegalForce. (*Id.* ¶¶ 56-57; Dkt. No. 292 at 5-6.)

At the hearing on Defendant's motion to dismiss, Judge Alsup suggested Defendant change the color of its accused mark "to try to end the case and to spare both sides the cost of litigation," not "because the district judge thought there was (or was not) infringement." (Dkt. No. 347 ¶ 19.) Although Defendant altered its parallelogram's color and shape, it did not promise not to revert to its old one. (Dkt. No. 273 at 14-16.) Plaintiff did not dismiss its case. (Dkt. No. 347 ¶ 20.)

Judge Alsup denied Defendant's motion to dismiss the complaint. (Dkt. No. 347 ¶ 108; Dkt. No. 26.) On August 15, 2024, Judge Alsup held an initial case management conference. (Dkt. No. 38.) The night before the conference, Plaintiff submitted a motion to compel totaling 347 pages, despite a court-imposed 12-page limit. (Dkt. Nos. 35, 36, 37.) Defendant then failed to appear at the conference, despite defense counsel having joined in filing a statement listing the correct time and place. (Dkt. Nos. 40-42; Dkt. No. 106 at 1-2.) To curb both sides' conduct, Judge Alsup entered case management orders. First, he denied the motion to compel and warned Plaintiff's counsel. (Dkt. No. 40.) Second, he considered but declined to impose sanctions on Defendant's counsel, and instead warned Defendant's counsel to avoid "wasted time." (Dkt. Nos. 41, 48.) Third, he ordered Plaintiff's counsel to "by the end of this week [] send a letter that proposes a date for your CEO [Abhyanker] to be deposed within one week of today." (Dkt. No. 44 at 4-5.) Finally, Judge Alsup proposed appointing a special master for discovery, and both sides agreed. (Dkt. Nos. 42, 55.)

## II.    THE MIDDLE: FROM APPOINTING A DISCOVERY SPECIAL MASTER (AUGUST 2024) TO CLOSE OF DISCOVERY (FEBRUARY 2025)

The Court first reviews the discovery Plaintiff needed to determine if continued litigation was warranted before summarizing the resulting discovery proceedings.

### A.    Discovery Needed to Determine Case's Value

Plaintiff's monetary relief demand was based on its view Defendant's referral service had used the accused mark to attract people with legal needs and refer them to lawyers, but not to Plaintiff, and that those people would have used Plaintiff but for trademark confusion. (Dkt. No. 1

¶ 58.) Plaintiff's view was not wholly implausible. Defendant's website, www.lawfirms.com, had a form where people with various legal needs could enter information so they could be referred to a lawyer. (Dkt. No. 347 ¶ 12.) Perhaps some people had visited this website, completed this form, and been referred to lawyers (profiting Defendant) but not to Plaintiff (damaging Plaintiff), all while believing the website was affiliated with Plaintiff given Plaintiff's asserted marks and Defendant's accused mark had some similarity.

Without further discovery, Plaintiff might have begun to estimate damages based on Defendant's website statement it had helped 115 clients find a law firm. However, without discovery, Plaintiff did not know either the infringement period and the share of Defendant's referrals Plaintiff was positioned to serve, and so would not be able to estimate damages. Moreover, prior to discovery, Plaintiff lacked evidence of Defendant's own profits per referral— an alternative measure of relief under the Lanham Act. *See* 15 U.S.C. § 1117(a). And, in this instance, there might have been direct and indirect ways by which Defendant had profited from any referrals—for example, by charging lawyers for subscriptions to directory services managed by other parts of Defendant's business empire (like Martindale) in exchange for referrals from the part using the accused logo (www.lawfirms.com). (Dkt. No. 347 ¶¶ 11-12.)

So, Plaintiff needed discovery to realistically evaluate its infringement claims and test its assumptions. From the start, Defendant could have produced evidence to negate the volume and value of any referrals and therefore obliterate any of Plaintiff's bad assumptions. Specifically, Defendant could have chosen to produce evidence showing what ultimately became clear: Defendant had generated no referrals using the mark for needs Plaintiff served. (Dkt. No. 364 at 9 n.25.)

### B.    Discovery Actually Sought and Produced

On September 12, 2024, Special Master Harold J. McElhinny granted a litany of Plaintiff's motions to compel documents containing information about Defendant's webform responses as well as basic information about Defendant's marketing and its business units. (Dkt. No. 66.) Defendant did not produce all documents ordered by the October 4, 2024 deadline. Instead, the day before the production deadline, Defendant appealed the special master's order and demanded

Judge Alsup decide it that same day.  (Dkt. No. 97.)  Judge Alsup denied Defendant's appeal.  (Dkt. No. 106.)  More than a week later, on October 18, 2024, Defendant produced some documents, repeated objections which had already been overruled, and attested it lacked any more responsive documents.  Specifically, Defendant stated "Patrick Stack, an MH officer [for business and legal affairs], stat[ed], under oath, that MH was withholding no documents under objection, other than privilege claims set out in its privilege log."  (Dkt. No. 114 at 2.)  The special master relied on Defendant's attestation to find the production late, but complete.  (*Id.* at 3.)

One of Defendant's October 18 productions was a list of referrals made via the www.lawfirms.com webform during the period Defendant had used the accused mark.  That list showed no referrals to trademark lawyers.  (Dkt. No. 214, *vacated in part*, Dkt. No. 247.)  Defendant also produced organizational and financial information bearing on other theories of how Defendant might have monetized and profited from referrals over time.

However, on February 2, 2025, Special Master McElhinny found he "should not have relied on [Director Stack's] sworn testimony" as to Defendant's prior productions.  (Dkt. No. 146 at 2.)  The Special Master's ruling cast doubt on the completeness of the October 18 productions and explained:

> In several earlier motions, Plaintiff ha[d] challenged Defendant's compliance with its duty to produce documents.  On at least two occasions, despite expressing doubts, I have relied on the sworn declaration of Defendant's Director of Business and Legal Affairs, Patrick Stack, that all responsive documents had been produced.
>
> The documents at issue are not trivial[;] they involve corporate organization, financial records of revenues, costs and profits, and the existence of advertising rate sheets.
>
> *It is hard to see how the Plaintiff can build an accurate damages case without them.*
>
> In every case, [Director] Stack has sworn to the Court either that the documents have been fully produced or, more often, that no such documents exist. . . .
>
> [Now], Plaintiff has provided deposition exce[r]pts from several of Defendant's employees stating the following: that they have seen corporate organizational charts that Defendant has represented to the Court do not exist; that the Defendant has at least one additional subsidiary that [Director] Stack did not mention in his 30(b)(6) deposition on the subject; and that they have seen *advertising rate*

United States District Court
Northern District of California

*sheets*, which once again, [Director] Stack has sworn do not exist.

In addition, in his deposition, [Director] Stack testified that the documents on revenue, costs and profits that [had been] produced by the Defendant were not [ones] maintained by the Defendant in the ordinary course of business, but [ones] *complied from actual company financial records that were not produced, by unknown employees acting on undisclosed instructions* from [Director] Stack in his role as the Legal Department employee overseeing this litigation which [he] could no longer recall.

(*Id.* at 2-3 (paragraphing and emphases added).)

So, Special Master McElhinny ordered curative productions. He also warned "the repeated and strategic failure of the [D]efendant to produce documents and forthright testimony in violation of its duties under the rules and in violation of express orders of the Court" could, if it continued, result in "a finding and recommendation to the District Court that the finder of fact should be instructed that the Plaintiff's opportunity and ability to build its proof of damages has been limited." (*Id.* at 4.) On February 5—or three days and seven orders later—the special master added:

As I have set out at length: In reading the Stack deposition, I became aware that ***Defendant did not intend to produce discoverable information concerning the corporate organization of the Defendant, and did not intend to produce its financial records as they are maintained in the ordinary course of business.***

While I have ruled on earlier disputes concerning the form in which that information had to be produced — document vs. depositions — I have consistently directed the Defendant that the information itself was discoverable, relevant and important and needed to be produced. In [the order recited above], I directed the Defendant to comply with its discovery obligations and tried to give it sufficient lead time, consistent with the time remaining [for fact discovery]. . . .

In this case, from the outset, Defendant has tried to limit the Plaintiff's ability to construct important parts of its case by limiting unilaterally the evidence it has provided.

(Dkt. No. 159 at 2-3 (emphasis added).)

Two days later, Defendant produced "exactly" what Special Master McElhinny had required as to organizational information. (Dkt. No. 168.) And by February 10, Defendant had produced something close to the same for financial information. (Dkt. Nos. 170, 178.) Defendant's productions resolved the special master's doubt about the October 18 productions.

Both sides made further discovery requests and motions. On February 11, Plaintiff moved

for an adverse instruction arguing Defendant was still withholding promised productions of financial documents. (Dkt. No. 172.) But the documents were already sitting in Plaintiff's mailroom. (Dkt. No. 178.) On February 12, Plaintiff's counsel improperly used the contents of a confidential email Defendant's counsel mistakenly sent him to accuse Defendant of spoliation and again request an adverse inference at trial. (Dkt. No. 185.) But the email's contents did not even support Plaintiff's argument. (*Id.*) That same day, Plaintiff's counsel sought reconsideration. But Plaintiff's new points contradicted its prior ones. (Dkt. No. 190 at 2.) The special master concluded: "The sound you are hearing is counsel's credibility walking out the door." (*Id.*)

Meanwhile, by February 13, 2025, Plaintiff also had completed its second likelihood of confusion survey. (Dkt. No. 193-4 at 40.) Although Plaintiff's first survey had used a control, Plaintiff tossed that survey, and designed a new one without a control. But Plaintiff's second survey did not produce results supporting Plaintiff; instead, its results showed no material confusion involving the accused mark. Plaintiff then provided its experts—and later, the Court—a misleading summary of what the survey said, and withheld adverse information from the experts. Plaintiff's lead counsel, Mr. Abhyanker, was personally involved in these efforts. (Dkt. No. 347 ¶¶ 69-72, 75-79; Dkt. No. 359 at 8-9.) Thus, by February 13, Plaintiff had not conducted a survey capable of identifying any likelihood of confusion involving the accused mark.

Defendant also sought more discovery. On February 14, two weeks before close of discovery, Defendant moved to compel a second deposition of Mr. Abhyanker, but for the first time as a percipient witness. (Dkt. No. 188.) Mr. Abhyanker had already been deposed as a Rule 30(b)(6) witness. (*Id.*) Defendant had noticed the deposition of Mr. Abhyanker for January 27, 2025 as a percipient witness, but Mr. Abhyanker had not appeared, prompting Defendant's motion to compel. (*Id.* at 8; Dkt. No. 56; Dkt. No. 65 at 2; Dkt. No. 146 at 1-2.) The special master granted the motion, but also granted Mr. Abhyanker's demanded accommodation the deposition occur in Chicago. (Dkt. No. 192.) On February 24, 2025, Abhyanker sat for the deposition. (Dkt. No. 378 at 11.)

Discovery closed on February 28.

### III.    THE END?: FROM FAILURE TO MOVE FOR SUMMARY JUDGMENT (BY APRIL 2025) TO WITHDRAWAL OF THE VOLUNTARY MOTION TO DISMISS (SEPTEMBER 2025)

#### A.    Failure to Move for Summary Judgment

Neither side moved for summary judgment by the April 17, 2025 deadline.  (Dkt. No. 39.)

#### B.    Plaintiff's Motion for Voluntary Dismissal

On February 25, 2025, Plaintiff moved for voluntary dismissal with prejudice.  (Dkt. No. 193.)  Specifically, Plaintiff requested "the Court: (a) Grant Plaintiff's motion to dismiss this case with prejudice [and] (b) Order that each party bear its attorney's fees and costs."  (*Id.* at 3.)  Plaintiff argued it would prevail on summary judgment or at trial, but the costs of continuing were not worth the limited damages recently made apparent.  (*Id.* at 2-3.)  Defendant agreed to dismissing with prejudice, but not to each side bearing its fees and costs.  (Dkt. No. 197.)

At the April 17, 2025 hearing on the voluntary dismissal motion, Judge Alsup told the parties:

> This case has been overlitigated to the nth degree.  So I'm going to let you talk me out of this[:]  I'm going to dismiss it with prejudice and make you [Plaintiff] pay all court costs without leave -- without prejudice to a motion for fees and expenses, which I won't say "yes" or "no" to right now.  That's the way I feel.  So you go ahead.  You can talk me out of it.

(Dkt. No. 228 at 9.)  Plaintiff did not at that time withdraw its voluntary motion to dismiss.  Instead, Plaintiff explained it did not deserve to bear all costs because Defendant had twice-designated Rule 30(b)(6) deponents whom Special Master McElhinny found woefully unprepared designees, and had not timely produced evidence showing monetary damages would be slight.  (*Id.* at 9-10.)  In response, Defendant argued it had provided Plaintiff a list of all of its referrals, with contact information, so Plaintiff could have confirmed Defendant did not refer any type of case Plaintiff could have brought.  (*Id.* at 20-22.)

#### C.    Judgment and Reconsideration

On May 15, 2025, Judge Alsup ruled that based on Defendant's October 18, 2024 production, Plaintiff had obtained all the discovery it needed to recognize it had no damages worth pursuing.  (Dkt. No. 214 at 3.)  Pursuant to dismissal terms Judge Alsup had proposed at the April 17 hearing, and seemingly not opposed by either side, Judge Alsup dismissed the action with

prejudice, awarded costs to Defendant (except those already allocated by the special master), and retained jurisdiction for any fee motion. (*Id*.) Judge Alsup then entered judgment. (Dkt. No. 215.)

Plaintiff both appealed and sought relief from judgment. (Dkt. Nos. 220, 221.) Judge Alsup granted the motion for relief for judgment. (Dkt. No. 247.) He reasoned Plaintiff's motion for voluntary dismissal was conditioned on each side bearing their own fees and costs, a condition the Court did not impose. (Dkt. No. 273 at 16-17.) In addition, because while Plaintiff's motion for relief from judgment was pending, Defendant had violated the mediation rules, Judge Alsup reappraised each side's broader responsibility for prolonging the litigation. Specifically, Judge Alsup stated, the "inequities that [had seemed] to be on [Defendant's] side have gone up in smoke." (*Id.* at 17.)

The parties then stipulated to vacate judgment, vacate the dismissal order, waive any jury demand, and proceed with a bench trial for only injunctive relief. (Dkt. No. 247.) Judge Alsup vacated his finding Plaintiff alone had prolonged the litigation after October 18. (*Id.* (citing Dkt. No. 214 at 1-4).)

## IV.    THE END: THE FOUR-DAY BENCH TRIAL (OCTOBER 2025)

On October 7, 27, 28, and 29, 2025, Judge Alsup held a bench trial. (Dkt. No. 347 ¶ 20.) Both sides complicated those proceedings. For example, while Plaintiff failed to obtain certified copies of its trademark registrations before trial, Defendant claimed to have obtained such copies but did not produce or stipulate to their contents. (Dkt. Nos. 337, 338, 340.) Eventually, Plaintiff obtained its own certified copies. (Dkt. No. 347 ¶¶ 100-102.) As another example, Plaintiff's counsel misrepresented the discovery record to Judge Alsup. (*Id.* ¶ 83-88.) But when Plaintiff's misrepresentation was revealed, Plaintiff's counsel flipped its representation of the record and its reasoning for how it had been harmed. (*Id.*)

At the end of trial, Judge Alsup found in favor of Defendant and against Plaintiff. (Dkt. No. 347 at 31.) The core question was whether a reasonably prudent consumer in the marketplace likely would have been confused about the origin of any of the services bearing any of the marks at issue. (*Id.* ¶¶ 22-23, 104.) The following passage summarized the findings (made exhaustively

9

United States District Court
Northern District of California

elsewhere) as to the *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), factors:

> Here, the factual underpinnings of every *Sleekcraft* factor point against plaintiff, as above.
>
> **[1.]**  *There was no [actual] confusion.*  Plaintiff conceded as much. Nor was confusion likely.
>
> **[2.]**  *The senior mark was weak.*  Plaintiff's Composite was on the "conceptually weaker end" and a commercial waif:  Plaintiff purchased no advertisements displaying it.  Plaintiff promoted "Trademarkia" instead, while recognition of "Trademarkia" did not translate into recognition of "LegalForce."  There was no credible evidence that anyone not involved in this litigation could even recall Plaintiff's Composite.
>
> **[3.]**  *The marks were not similar*.  Yes, Plaintiff's Composite and Defendant's Composite each arranged a squat parallelogram alongside a two-worded description related to law.  But the arrangement was itself a functional commonplace, there were differences in the symbols ("LF" versus column, with a gradient of color versus one flat shade), there were differences in the words (bolding one versus two words, while describing one legal team versus a service reaching all law firms) — and the differences stood out.
>
> **[4.]**  *The marks have not appeared in the same specific marketing channels.*  No web search retrieved both.  And, while plaintiff's mark was on LinkedIn but not Instagram, defendant's mark was on Instagram but not LinkedIn.  There was no credible evidence that the senior and junior mark *ever* appeared head-to-head or serially in the same channel or likely would.
>
> **[5.]**  *The services were not related.*  Yes, both parties' services relate to law, at the highest level of generality.  But providing legal services as a law firm is not the same as selling leads to many law firms as a referral service — not in fact, nor as it appears to those using each. Plaintiff's www.legalforce.com law firm mainly served individual businesspeople with trademark issues.  Defendant's www.lawfirms.com referral service mainly served individual people looking to find and compare lawyers to help with a personal need such as after an accident.  Yes, there was some overlap.  It was incidental, not targeted:  Defendant collected a small number of leads for trademark lawyers during all periods plaintiff put at issue, and zero during the period using the accused mark.
>
> **[6.]**  *Nor will there be any expansion*.  Plaintiff has had years to expand.  Its newfound plan to do so is a litigation gimmick.
>
> **[7.]**  *People seeking lawyers are not careless.*
>
> **[8.]**  Moreover, *there was no intent to confuse.*  Defendant had no reason to do so.  Plaintiff was not well known, the two did not overlap much in what they offered, and neither was likely to change much.

(*Id.* ¶ 105 (paragraphing added).)  Judge Alsup also made findings as to credibility and weight. His findings included many of the procedural findings described above, including that Plaintiff had tossed a first consumer confusion survey when it did not like its results, then had misrepresented the results of a second when it did not like those, either.  (Dkt. No. 347 ¶¶ 69-73, 75-76, 78; Dkt. No. 359 at 7-10.)

Judge Alsup then entered judgment against Plaintiff.  (Dkt. No. 348.)  Plaintiff moved to amend the findings but without "ask[ing] the Court to reverse its credibility assessments, revisit liability, or excuse evidentiary failures."  (Dkt. No. 354 at 4-5.)  Judge Alsup declined to do so. (Dkt. No. 359.)

## V.    PARALLEL PROCEEDINGS: ALTERNATIVE DISPUTE PROGRAM (ADR) AND MAGISTRATE JUDGE SALLIE KIM

Parallel to the above proceedings, the parties proceeded in ADR and before Judge Kim.

ADR Program Director Jill Kopeikin took over from an initially assigned mediator to oversee the parties' required mediation.  (Dkt. Nos. 62, 81.)  However, these mediation sessions spun out new conflicts.  For example, material surfaced in mediation, which the parties were duty-bound to keep sealed from the district judge—by both ADR Local Rule 6-12 and by agreement, (Dkt. No. 72-2)—was typed into substantive filings and submitted to Judge Alsup by Defendant's counsel.  In deciding what to do about Defendant's counsel's filings, Magistrate Judge Sallie Kim was required to enter untold numbers of orders on the ADR docket, two of which Judge Alsup could view.  (Case No. 24-ADR-00669-WHA (SK) ("ADR") Dkt. Nos. 8, 11.)  Judge Kim also entered four orders on the district court docket regarding procedural concerns emanating from these disputes.  (Dkt. Nos. 105, 237, 242, 387.)  Judge Alsup and the undersigned did similarly five times.  (Dkt. Nos. 76, 77, 93, 375, 382.)  These orders brought the total number of orders stemming from the parties' conduct to over 50 orders by four neutrals.

The parties resolved the first mediation complaint against Defendant.  (ADR Dkt. No. 8 at 8.)  This prompted an order from Judge Alsup to follow the ADR Local Rules.  (Dkt. No. 77.)

The second such complaint against Defendant was decided against Defendant.  According to Judge Kim, Defendant made frivolous arguments to defend itself.  For example, Defendant

11

argued Federal Rule of Evidence 408 did not prohibit the disclosures made and cited what Defendant's counsel said was Ninth Circuit authority:

> [I]n Moshir v. Automobili Lamborghini AM., LLC, 927 F.Supp.2d 789, 794 (9th Cir. 2013), the 9th Circuit, in a published opinion, expressly discussed settlement offers made in mediation, not just in informal settlement discussions.

(ADR Dkt. No. 8 at 6 (quoting Defendant).)  But "[e]ven a cursory glance at the citation show[ed] that *Moshir* c[ould not] be a published opinion from the Ninth Circuit, as Ninth Circuit opinions are not published in the Federal Supplement.  Moreover, any lawyer who reads the opinion can see that the case is from the U.S. District Court for the District of Arizona."  (*Id.*)  Furthermore, Defendant argued even if ADR Local Rule 6-12 did prohibit the disclosure, Defendant's counsel's failure to read and to follow local rules was ordinary, not incompetent.  Defendant pretend-quoted its own defense counsel to make this argument:

> It did not occur to defense counsel to think: "I wonder if the local ADR Rules impose additional restrictions, such that evidence of the demands made in the Court-sponsored mediation are not admissible, even though demands made in, say, a JAMS mediation, would be admissible per the Ingram and Moshir cases."

(ADR Dkt. No. 8 at 7.)  But "[i]gnorance of the law is not an excuse for violation of the law." (*Id.*)  Judge Kim added:

> "Defendant cannot claim ignorance.  Plaintiff filed the first motion for sanctions and first complaint with the ADR Program [alleging] Defendant disclosed actions and comments by [Mr.] Abhyanker during the phone conference on September 17, 2024.  The first complaint specifically referred to and quoted ADR Local Rule 6-12 and the Confidentiality Agreement.  The District Court even admonished the parties to read and follow the ADR Local Rules."

(*Id.* at 8 (citing Dkt. No. 77).)[2]  So, Judge Kim found Defendant's counsel had violated the rules

---

[2]   Indeed, Defendant's counsel had been admonished to follow local rules on at least seven other occasions leading up to the violation at issue.  (Dkt. No. 66 at 2 (initial productions not "compli[ant] with the local rules"); Dkt. No. 100 at 2 ("failed to meet and confer before filing its request" as required by local rules and special master's orders); Dkt. No. 139 at 1 ("repeated failure to understand or to follow the local rules that apply to the case"); *id.* at 3 n.2 ("I assume that [Attorney] Schuman just wanted me to know what a bad guy [Attorney] Abhyanker is[, but] his email also violate[d] several of the Local Rules"); Dkt. No. 148 at 1-2 ("[Attorney] Schuman has written me again, once again complaining about [Attorney] Abhyanker . . . [and] [i]t appear[s] that [Attorney] Schuman has intentionally violated this Court's rules . . . [and] is ORDERED TO SHOW CAUSE"); Dkt. No. 157 at 1 (sanctioning Attorney "Schuman for violation of the Local Rules and an Order"); Dkt. No. 171 at 2 (". . . DENIED WITHOUT PREJUDICE to permit

and required them to pay Plaintiff's reasonable attorney's fees for the related disputes. (*Id.* at 11.) However, Judge Kim later amended the second part of her order; because the violation had not resulted from "bad faith," it did not merit fee shifting. (ADR Dkt. No. 11 at 2 (citing *Zambrano v. City of Tustin*, 885 F.2d 1473, 1478 (9th Cir. 1989)).)

After learning of this result, Judge Alsup admonished Defendant's counsel for having "violated our mediation rules, a[s] the magistrate judge has so found. . . . You gotta follow the rules. Don't say you didn't know. You had done it before. So you knew. You knew." (Dkt. No. 273 at 17.) Citing these violations, Judge Alsup stated the purported equities favoring Defendant as to any award of costs or fees had "gone up in smoke." (*Id.*) Judge Alsup later clarified he had not imposed sanctions on Defendant or Defendant's counsel. (Dkt. No. 387.)

The ADR docket remains active. When Defendant moved for fees, Judge Kim was forced to order the fees motion be sealed and Defendant file a new motion for fees, delaying the consideration of this motion. (Dkt. No. 387.)

## VI.     THE PENDING MOTIONS

Defendant moves for attorney's fees, (Dkt. No. 364, as amended pursuant to Dkt. No. 387), and Plaintiff moves to retax costs, (Dkt. No. 372). The motions on fees and costs are now fully briefed.[3] No hearing is needed. *See* N.D. Cal. Civ. L.R. 7-1(b).

## DISCUSSION

## I.     DEFENDANT'S MOTION FOR ATTORNEY'S FEES.

"The court in exceptional cases *may* award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a) (emphasis added). The party seeking fees must establish any facts supporting its award under the totality of the circumstances and by a preponderance of the evidence. *See SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1181 (9th Cir. 2016)

---

Defendant to file a Motion that complies with the Local Rules.")

[3] Defendant's counsel multiplied even these proceedings. Earlier, Judge Alsup granted an extension for Plaintiff to file its reply to its motion to retax costs but cautioned: "This is not an opportunity to file a sur-reply *on Defendant's motion for fees*, or on anything else. Any briefing not directly responsive to the motion to retax costs will be struck." (Dkt. No. 382 at 22 (emphasis added).) In response to this admonition, Defendant filed its own sur-reply *on Plaintiff's motion to retax costs*. (Dkt. No. 385.) The Court STRIKES Defendant's unsolicited and cumulative filing. (Dkt. No. 385.)

United States District Court
Northern District of California

(en banc) (per curiam).  Even if on those facts the Lanham Act "permits" an award, it "does not mandate" one.  *See Nutrition Distrib. LLC v. IronMag Labs, LLC*, 978 F.3d 1068, 1081 (9th Cir. 2020).  Instead, the district court retains equitable discretion to decide whether to award fees.  *See Sun Earth, Inc.*, 839 F.3d at 1181.

Here, Plaintiff's case became exceptional because Plaintiff alleged facts it knew to be false, discovered other facts demonstrating its case was meritless, took steps to obscure those facts, and continued to litigate its action.  However, Defendant's response was also exceptional. Defendant frivolously delayed discovery which would have removed any doubt Plaintiff's case was meritless, violated local rules and court orders repeatedly in ways that also delayed resolution, and failed to move for summary judgment even after it had evidence to dispose of Plaintiff's claims.  So, only a small fraction of Defendant's nearly $1.3 million in fees sought was reasonably incurred.  Even if some larger fraction was reasonable and permitted by statute to be awarded, the fraction the Court identifies accords with the Court's equitable discretion to award.

### A.    Statutory Permission to Award Fees

#### 1.    Exceptional Case

"An 'exceptional' case is simply one that stands out from others with respect to the *substantive* strength of a party's litigating position (considering both the governing law and the facts of the case) *or* the unreasonable *manner* in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014) (emphases added); *see SunEarth, Inc.*, 839 F.3d at 1181 (applying standard to Lanham Act claims).

#### a.    Objective Merits

Plaintiff's Lanham Act claims, as well its undeveloped state law claims, required showing a likelihood of confusion between Plaintiff's asserted marks and Defendant's accused mark.  (Dkt. No. 347 ¶¶ 21-22, 104, 112-114.)  A plaintiff usually cannot prove likelihood of confusion if there is: (1) no similarity in the marketing channels where the marks appear, (2) no similarity between the plaintiff's business line and the defendant's business line, and (3) no similarity between the plaintiff's mark and the defendant's mark.  *See Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999) (applying *Sleekcraft*, 599 F.2d at 348-49).  Losing claims

14

become especially clear if additional *Sleekcraft* factors point against confusion.  *See Network Automation, Inc. v. Adv. Sys. Concepts, Inc.*, 638 F.3d 1137, 1148-49 (9th Cir. 2011).

Judge Alsup's findings of fact and conclusions of law comprehensively explain why Plaintiff's claims lacked merit.  (*See* Dkt. No. 347.)  Of note, Judge Alsup found not only the three frequently dispositive factors but instead all eight *Sleekcraft* factors weighed against likely confusion.  (*Id.* ¶ 106.)  There was also no instance of actual confusion.  (*Id.* ¶ 24.)  While noting some facts underlying the commonly dispositive factors, the Court focuses on Plaintiff's knowledge of those facts and on how Plaintiff overstated some facts it knew from the start and obscured others it learned as the case went on.

### i.    Similarity of the Businesses

Although there was little to no overlap between Plaintiff's and Defendant's businesses, Plaintiff knowingly overstated the possibility for overlap when it brought this case and maintained this litigation after learning there was none.  First, Plaintiff's complaint alleged  "both [companies] target consumers who are in need of legal services" and "both companies operate in the *same* market."  (Dkt. No. 1 ¶ 52.)  But even at the start, Plaintiff knew or should have known the alleged overlap was so overstated as to be false.  Plaintiff knew it was a law firm focused on trademark law.  Plaintiff also knew Defendant is not a law firm but an online referrer to law firms of many kinds.  So, Plaintiff knew or should have known that at most some fraction of Defendant's referrals might be to law firms focused on trademark law, putting at most some *fraction* of Defendant's *downstream* business partners in direct rivalry with Plaintiff.  Plaintiff and Defendant were plainly not, as Plaintiff had alleged, "in the *same* market."  (*Id.*)

Moreover, during discovery, Plaintiff learned there was not even an indirect conflict as to referrals for trademark law.  Discovery showed Defendant had referred few to no persons having such needs, and none during the period of alleged infringement.  Instead, Defendant mainly referred persons with personal injury and employment problems, not businesses with trademark or other intellectual property problems.  (Dkt. No. 347 ¶¶ 39-45.)

### ii.    Likelihood of Expansion

Plaintiff also had no plans to expand.  However, after it became obvious Plaintiff was not

15

in the same business as Defendant, Plaintiff pretended it soon would be.  At trial, Plaintiff presented testimony it was planning to serve or to refer people having broader legal needs, that is, people like those whom Defendant referred.  But Judge Alsup found those "supposed new plans [we]re a fanciful gimmick invented solely for trial purposes."  (*Id.* ¶ 47.)

### iii.   Similarity of Marketing Channels

As Plaintiff and Defendant did not offer the same services to the same people, the parties did not market their services in the same places.  Moreover, Plaintiff's asserted marks appeared almost nowhere.  (*Id.* ¶¶ 27-38.)  The complaint alleged Defendant's accused mark had appeared in Instagram Ads and Google Ads, and Plaintiff's marks had appeared in "similar marketing channels."  (Dkt. No. 1 ¶¶ 24-25.)  But this allegation strained the facts as Plaintiff knew or should have known them.

At trial, Plaintiff presented no evidence its asserted marks had ever appeared in any paid advertisement.  Plaintiff also presented no credible evidence any of the marks at issue had even appeared in Google's unpaid search results, much less in circumstances likely to lead to confusion.  And, Plaintiff presented no credible evidence the scarce places where its asserted marks had appeared—including in news stories written a decade before the accused mark was first used, on Plaintiff's corporate LinkedIn profile and website, and at tech conferences after the accused mark was no longer being used—were "similar" enough to the places in which Defendant's accused mark had appeared to be seen by the same kinds of consumers and therefore cause confusion.  (Dkt. No. 347 ¶¶ 27-38.)  At trial, to continue arguing the asserted and accused marks would appear in circumstances which could give rise to confusion, Plaintiff pivoted to an entirely new theory involving artificial intelligence, which was unsupported by any credible evidence.  (*Id.* ¶¶ 31-32.)

### iv.   Commercial Strength of the Asserted Marks

Plaintiff did not invest much in its marks, and they were not well known.  (*Id.* ¶¶ 54-57, 81-88, 109; Dkt. No. 359 at 10-15.)  Plaintiff's complaint alleged it had spent $10 million to strengthen various LegalForce marks.  (Dkt. No. 1 ¶¶ 4, 6.)  However, Plaintiff knew or should have known this allegation was false.  At trial, Plaintiff never introduced any evidence of any

payment for anything. Even if Plaintiff spent $10 million on a mark, it did so on marks that did not include "LegalForce" or "LF" and were therefore not allegedly infringed. Plaintiff's primary mark was "Trademarkia." (*Id.* ¶¶ 55-57.) Plaintiff failed to prove even that its own clients recognized "LegalForce," whereas they recognized "Trademarkia." Plaintiff used "Trademarkia" so pervasively its in-house lawyer who appeared at the initial case management conference listed his email as "@trademarkia.com." (*Id.* ¶¶ 54-57, 81-88, 109; Dkt. No. 359 at 10-15.)

### v.    Conceptual Strength of the Asserted Marks

Plaintiff's own expert later admitted its composite mark was "conceptually on the weaker end." (Dkt. No. 347 ¶ 60.) Given Plaintiff is a law firm specializing in trademark law, Plaintiff knew or should have known this factor would not strongly favor a finding of confusion. To be sure, Plaintiff's marks were not so generic as to be unprotectable. One of the marks had even become "incontestable" as valid. But, the marks were not so commercially promoted and not so conceptually distinct as to be readily called to mind and confused for another mark that was similarly indistinct. Mere validity does not give a mark carte blanche to exclude other marks. (*Id.* ¶ 107 (citing *M2 Software, Inc. v. Madacy Ent., Corp.*, 421 F.3d 1073, 1081 (9th Cir. 2005); *Sleekcraft*, 599 F.2d at 350).)

### vi.    Similarity of the Marks

The marks at most had weak similarities, but not any similarities likely to confuse relevant consumers. Each mark arranged relatively conventional or descriptive elements in relatively functional ways, such that their similarities were largely ones consumers tune out. (*Id.* ¶¶ 51, 65-68.) As explained previously, the complaint plausibly alleged similarities. But early in the litigation, Defendant changed its accused mark. (*Id.* ¶¶ 19-20.) And, later in the litigation, Plaintiff learned through not one but two likelihood-of-confusion surveys that the vast majority of consumers did not find the accused mark confusingly similar to Plaintiff's marks—results Plaintiff obscured or overstated at trial. (*Id.* ¶¶ 69-73, 76, 78; Dkt. No. 359 at 7-10.)

### vii.    Degree of Consumer Care

Businesses seeking legal services for trademark law exercise at least moderate care. Defendant's entire business is premised on consumers of legal services putting time and attention

17

into finding and comparing lawyers who fit their needs. And, Plaintiff's proposed damages model asserted its clients typically spend $600 with its law firm. (Dkt. No. 364-2 at 8.) So, Plaintiff knew or should have known from the start this factor would be unlikely to favor it. (Dkt. No. 347 ¶¶ 50-51.)

### viii.    Plaintiff's Arguments Fail to Persuade

First, Plaintiff argues it "might have continued litigating just to be a thorn" but "ceased the fight once management made an executive decision in view of new facts." (Dkt. No. 367 at 14.) But Plaintiff never ceased litigating; instead, Plaintiff insisted on trial and is appealing.

Second, Plaintiff argues its complaint survived a motion to dismiss. (Dkt. No. 367 at 13.) But the complaint included allegations so overstated as to be false. Moreover, even if the other alleged facts alone would have survived dismissal, Plaintiff knew, came to know, or should have known by February 15, 2025, the facts could not sustain its claims. It nonetheless kept litigating.

Third, Plaintiff argues because both sides took discovery, the claims could not have been meritless. (Dkt. No. 367 at 14.) But this argument fails to account for the same deficiency; although Plaintiff discovered additional reasons its claims lacked merit, it still proceeded to trial.

Fourth, Plaintiff argues "two different experts with considerable experience" offered opinions at trial to support Plaintiff's case. (*Id.*) But Plaintiff paid these experts—neither of whom had served as experts in litigation ever before—to offer opinions without informing them of the adverse facts Plaintiff had discovered. (Dkt. No. 347 ¶ 76; Dkt. No. 359 at 5-7.) Judge Alsup also found one of these two experts was not credible. (Dkt. No. 347 ¶ 80.)

Fifth, Plaintiff emphasized it dropped any claim to damages when it became clear damages would be paltry, then pursued only an injunction because an injunction still had "significant economic value"—so, Plaintiff's litigation choices remained tailored to its claims' prospects even after bad evidence developed. (Dkt. No. 367 at 14.) But, the lack of material damages did not arise because there was confusion but no loss; it arose because there was *no* confusion. Indeed, Plaintiff conceded there was no actual confusion. (Dkt. No. 347 ¶¶ 24-25.) Further, that past uses of the accused mark had caused no confusion suggested *future* uses of the accused mark likely would cause no confusion, especially given all the other evidence supporting that result. Finally,

18

Defendant had stopped using the accused mark, and there was no reason to believe Defendant would resume using it. (*Id.* ¶¶ 19-20.) If the case was not economic to pursue for damages, it also was not economic to pursue for an injunction. Indeed, Plaintiff states "the case [may have become] uneconomical, [but] not meritless." (Dkt. No. 367 at 14.) The record establishes the case was both.

Similarly, Plaintiff argues if Defendant had only agreed never to return to using the accused mark, Plaintiff would have dismissed the action. (*Id.* at 10.) Again, even if Defendant resumed using the mark, Plaintiff had all the evidence needed to conclude Defendant's conduct would confuse no one. Plaintiff also complains Defendant "in defiance of the Court's guidance" altered the accused mark in one way rather than another. (*Id.* at 9.) But Plaintiff misses the point of Judge Alsup's suggestion. (Dkt. No. 347 ¶ 19.) If continuing to litigate claims about the accused mark was unreasonable, continuing to litigate claims about a mark altered to become even more distinct (by whatever means or measure) was also unreasonable. (*Id.* ¶ 110.)

Finally, Plaintiff argues at close of discovery, Plaintiff tried to drop its claims for damages and an injunction by moving to voluntarily dismiss its entire action on the condition no costs or fees be shifted. (Dkt. No. 193.) But, Plaintiff's willingness to dismiss its claims supports the conclusion its claims were meritless, and Plaintiff knew so. Moreover, once Judge Alsup denied Plaintiff's offer of a dismissal with each side to bear its own fees and costs, Plaintiff withdrew its offer and asked to proceed to a bench trial. (Dkt. No. 247.) Assuming the truth of Plaintiff's statement it wanted to proceed to trial to avoid paying costs and fees, (Dkt. No. 273 at 4), Plaintiff could have instead accepted dismissal and sought to fight costs or fees on their own merits. Instead, Plaintiff proceeded to trial on a claim it knew lacked merit.

\* \* \*

In sum, Plaintiff's claims appeared just a bit better than meritless from the start, even when buttressed by Plaintiff's knowingly false allegations. And Plaintiff's claims cratered as the evidence came in. By February 13, 2025, Plaintiff had received the results of its second consumer survey showing no material likelihood of confusion, even under circumstances it had constructed. And by February 15, 2025, Plaintiff had received and pressure-tested Defendant's productions

showing Defendant had referred nobody to trademark lawyers during the period it used the accused mark. Other dissimilarities between business lines, marketing channels, and the marks were—at least by then—clear. The case was meritless, and Plaintiff knew or should have known it by February 15, 2025.

### b.      Subjective Motivations or Misconduct

Even if a case has some objective merit, bringing or maintaining it in bad faith or by way of misconduct can still make the case exceptional. *See SunEarth Inc.*, 839 F.3d at 1181. And as the merits of Plaintiff's case plummeted, Plaintiff's misconduct escalated, including Plaintiff's overstating or obscuring the merits to maintain its case.

As explained above, Plaintiff tossed one survey with unfavorable conclusions, crafted another, and misleadingly fed its experts partial information to present to the Court. (Dkt. No. 347 ¶ 76; Dkt. No. 359 at 5-10.) Both Plaintiff's chief executive officer and Plaintiff's trial counsel were aware of this conduct because one person, Mr. Abhyanker, played both roles. (Dkt. No. 347 ¶ 76.) And not only did Plaintiff's complaint include overstatements and outright falsities, but so did the trial testimony of Plaintiff's only witness (Mr. Abhyanker), and trial representations by trial counsel (also Mr. Abhyanker). (*Id.* ¶ 82; Dkt. No. 359 at 10-15.) Indeed, even after Judge Alsup gave Mr. Abhyanker an opportunity to refresh his recollection and to report back at trial about the procedural orders in this case, Mr. Abhyanker returned with a fresh fabrication about what had transpired. (Dkt. No. 347 ¶¶ 83-88; Dkt. No. 359 at 1-5.) Having reviewed the record for himself, Judge Alsup told Mr. Abhyanker: "I hope when this case goes up to the Court of Appeals, the Court of Appeals will have the ability to take with a grain of salt the things that counsel is saying in this case and at least check it against the record, as we did here." (Dkt. No. 347 ¶ 88.) So, Plaintiff's litigation was infected by bad faith at least after February 15, 2025.

Plaintiff's opposition brief fails to rebut its misconduct. First, Plaintiff repeats arguments rejected above. Second, Plaintiff points the finger at Defendant's misconduct and the principle that one "who seeks equity must do equity." But Defendant's misconduct does not excuse Plaintiff's misconduct. Third, Plaintiff argues it cannot be blamed for alleging damages until later in discovery without knowing information to refine its estimates. But, as explained below, the

20

Court does not blame Plaintiff for that failure. And Plaintiff does not even attempt to rebut with the same specificity any other contention it knowingly made false allegations in its complaint or put on false testimony at trial. (*Compare* Dkt. No. 364 at 6-16, *with* Dkt. No. 367.)

### c.    Summary

In sum, not all losing cases, nor all aggressively litigated cases, are exceptional. *See BillFloat Inc. v. Collins Cash Inc.*, 105 F.4th 1269, 1278 (9th Cir. 2024). However, bad claims become worthy of fee-shifting when a plaintiff knows, comes to know, or should know the claims are false but advances them anyway in a drawn-out campaign without prospect of success except by settlement with a defendant it believes is desperate to avoid the cost of vindicating itself in court. This case at least became exceptional in that manner after February 15, 2025.

The Court responds below to Defendant's argument the case became exceptional far earlier by assessing to what extent Defendant's requested fees are reasonable.

### 2.    Reasonable Fees

In exceptional cases, the district court "may award *reasonable* attorney fees." 15 U.S.C. § 1117(a) (emphasis added). Such fees may include those accrued in the motion for fees. *See Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1224 (9th Cir. 2023). They also may include non-taxable costs which track with the fees. *See Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*, 668 F.3d 677, 690 (9th Cir. 2012), *abrogated on other grounds by SunEarth, Inc.*, 839 F.3d 1179.

With some exception, all attorney's fees Defendant incurred from the filing of Plaintiff's voluntary motion to dismiss on February 25, 2025, (Dkt. No. 193), until the entry of Plaintiff's stipulated withdrawal of that motion on September 11, 2025, (Dkt. No. 247), would not have been incurred but for Plaintiff's unreasonable litigation conduct or were totally wasted because of it. As explained above, Plaintiff knew its case was meritless at least by February 15, 2025. Plaintiff's subsequent conduct was therefore unreasonable. For example, in its motion for voluntary dismissal, Plaintiff stated it would keep litigating and would win, thus imposing fees and costs on Defendant despite Plaintiff's knowledge its case was meritless. In the alternative, Plaintiff agreed to dismiss its action if Defendant forwent recovering fees and costs ordinarily recovered by the

21

prevailing party.  When Judge Alsup urged Plaintiff to accept dismissal subject to costs being awarded by the Court, Plaintiff appeared to agree.  But after dismissal and judgment were entered, Plaintiff sought relief from judgment, withdrew its conditional motion for dismissal, and insisted on trial.  (Dkt. No. 247.)

As evidenced by the record and Defendant's counsel's sworn invoices, (Dkt. Nos. 364-2, 364-3), much of Defendant's counsel's billing during this period was the result of Plaintiff's exceptional and unreasonable conduct, was reasonable, and was well documented.  In sum, Defendant briefed the illusory dismissal motion and accompanying motion to disqualify Defendant's counsel, appeared for a hearing on these issues, prepared the ordered response after the hearing, prepared a bill of costs after entry of dismissal and judgment, briefed Plaintiff's motion for relief from judgment, and appeared at the hearing on that motion.  However, the Court declines to award fees for Defendant's counsel's preparation of a fees motion which improperly disclosed confidential mediation materials in violation of the ADR rules, briefing in opposition to the ensuing sanctions motion, and a fresh fees motion with redactions applied pursuant to Judge Kim's determination Defendant's counsel had violated ADR rules.  In addition, as set out below, Defendant made some contingent preparations for trial, and Plaintiff later chose to go to trial. Defendant's invoices also include entries which either obscure their contents, (Dkt. No. 364-3 at 35 ("Emails")), or else merge reasonable and unreasonable contents, (Dkt. No. 364-2 at 92 (entry for 13-June)).  Those hours cannot be parsed.

Defendant thus has proven by a preponderance the following fees are reasonable:

| Dates (2025) | Attorney Steve Schuman | | | Attorney Wendy Giberti | | |
|---|---|---|---|---|---|---|
| | Hours Credited | Fees Credited ($600/hr) | (Dkt. No. 364-3 at ECF p.) | Hours Credited | Fees Credited ($325/hr) | (Dkt. No. 364-2 at ECF p.) |
| Feb. 16-28 | 10.4 | $6,240 | 31 | 21 | $6,825 | 83 |
| Mar. | 0 | $0 | 33 | 23.25 | $7,556 | 84 |
| Apr. | 9.3 | $5,580 | 35 | 59.25 | $19,256 | 85-87 |
| May | 0 | $0 | 37-39 | 0.25 | $81 | 88-90 |
| June | 4.3 | $2,580 | 40-42 | 57.75 | $18,769 | 91-93 |
| July | 0 | $0 | 43-44 | | $0 | 94 |
| Aug. | 2.4 | $1,440 | 45 | | $0 | 94-95 |
| Sep. 1-11 | 8.6 | $5,160 | 48 | 4.5 | $1,463 | 96 |

United States District Court
Northern District of California

| Subtotal | 35 | $21,000 | | 166 | $53,950 | |
|---|---|---|---|---|---|---|

This amounts to $21,000 for 35 hours of work by Attorney Steve Schuman, and $53,950 for 166 hours of work by Attorney Wendy Giberti.  (Their rates are reasonable given their experience, the tasks, and the market.)  The combined total of Defendant's reasonable fees is $74,950.

The Court declines to award any additional fees incurred after the case became exceptional on February 15, 2025.  First, Defendant could have avoided fees incurred for trial by moving for summary judgment, but Defendant inexplicably failed to do so.  Second, rather than continue to oppose Plaintiff's motion for relief from judgment, Defendant's counsel stipulated to trial, even while reciting how much trial would cost, how little the claims were worth, and yet how sweet vindication would be—especially the attorney's fees.  As Judge Alsup cautioned:

> **THE COURT:** Okay.  I gave you that option.
>
> **[ATTORNEY RAJ ABHYANKER, FOR PLAINTIF]:**  To withdraw [the voluntary dismissal motion].
>
> **THE COURT:** And you've withdrawn it, correct?
>
> **MR. ABHYANKER:** Yes.  We also waive all damages in this case and just seek an injunction.
>
> **THE COURT:** You waive all damages and you will simply seek an injunction at a bench trial?
>
> **MR. ABHYANKER:** Yes, Your Honor.
>
> **[ATTORNEY STEVE SCHUMAN, FOR DEFENDANT]:** Well, you gave me some really good advice to come prepared, and I thought about all the things that might happen here today, and guess what I didn't think about and ask the Court?
>
> **THE COURT:** I guess that's your problem.
>
> **MR. SCHUMAN:** It is.  Apparently it is.  *So I'm going to do what I think the client would like me to do*, which is to say, on the condition, the material term he's withdrawn all damages and waived jury, let's have a bench trial on the injunction and let's see if you find infringement.
>
> **THE COURT:** Okay.
>
> **MR. SCHUMAN:** *And then when I come back and ask for fees, we'll see what you say*.
>
> **THE COURT:** All right.  Let's make it very clear.  What you're suggesting is a bench trial, all damages waived, and the relief sought is injunctive only.

(Dkt. No. 273 at 10 (emphasis added).)  Judge Alsup further warned counsel to ensure the client was informed:

> **THE COURT:** You both are going to spend more money trying this case, and even if it's two days, than this case is worth.
>
> **MR. SCHUMAN:** *By definition, because he's not seeking any money.*
>
> **THE COURT:** But even if that injunction had some value, it's not much.
>
> **MR. SCHUMAN:** *It's zero.*
>
> **THE COURT:** You two lawyers should come to a sensible -- you know what, I've been in this job 26 years, and before that I was a lawyer doing what you're doing for 24 years.  It actually is more than that.  But you all should rise to the occasion and be sensible and settle this case.  However, if you don't, whammo, October 27, actually October 22 final pretrial conference.
>
> **MR. ABHYANKER:** Yeah.  And for the avoidance of all doubt, if we had a stipulation that they will not bring the previous logo back and each side bears their own costs and fees, this case is over.  There's no need for even a bench trial.
>
> **THE COURT:** Well, he is saying he's not agreeing to that.
>
> **MR. SCHUMAN:** Not -- first of all, *I don't have the authority to agree to it with my clients here.  And second of all, they ran up three quarters of a million dollars in fees on a case that was completely frivolous.*  [NB: Defendant now seeks about another half million dollars for the cost of trial.]
>
> **THE COURT:** Well, what if I were to grant the injunction?
>
> **MR. SCHUMAN:** You won't.  I'm confident.
>
> **THE COURT:** How do you know?
>
> **MR. SCHUMAN:** Because I trust you to follow the law.
>
> **THE COURT:** Oh, no, no.  You might lose, I might give the injunction, then your hope for all those attorney's fees might evaporate.
>
> **MR. SCHUMAN:** *You might deny the motion for fees anyways.*  I don't have any certainty.  *But number one, the injunction is of zero value in and of itself, because both logos were never worth a nickel, neither of them, neither side.*
>
> **THE COURT:** Here you are *spending all this money over something.*
>
> **MR. SCHUMAN:** *No, we're defending ourselves because we got*

United States District Court
Northern District of California

*sued with an initial disclosure statement saying he had damages of $15 million. That prompts us to defend ourselves. Not the logo, which we changed.*

**THE COURT:** No, negative, negative. We're not going to go into this. You two are impossible. So we're having the wheels of justice will slowly crank, and out the other side of the wheels of justice will come some dust and pieces of paper, and then you can take it up to appeal if you don't like the way it comes out. And you would be making a mistake to automatically assume that you're going to wind up getting attorney's fees out of this. *You should talk it over with your client.*

**MR. SCHUMAN:** I will, Your Honor.

**THE COURT:** And I promise you both this. I'm going to decide this case fair and square on the record, fair and square on the record of the trial, not of the record of all the wrongdoing and name-calling that got to us this point, but the trial. And you better know the Rules of Evidence.

(*Id.* at 19-22 (emphases added).)

Third, Defendant argues that it should at least receive fees for moving for fees and costs a second time, that is, for the instant briefing. But when moving for fees for a second time, Defendant for a second time filed a motion, (Dkt. No. 363), which Defendant admits again included *the same disclosure of prior mediation confidences previously ordered to be sealed*, (Dkt. No. 364-1 at 1), which required Judge Kim again to intervene, (Dkt. No. 387). Defendant refiled the motion. (Dkt. No. 364.) All fees motions were made more costly by Defendant's counsel's failure to follow rules even after having been repeatedly apprised of them. Its records are not so detailed as to permit parsing any reasonable remainder.

Fourth, Defendant argues that all fees and costs for Plaintiff's chief executive officer's personal deposition conducted on February 24, 2025 were reasonable to incur given Plaintiff's exceptionally meritless case and misconduct. The record reveals otherwise. Plaintiff's chief executive officer already had been deposed as a Rule 30(b)(6) designee on October 4, 2025. And by February 15, 2025, Plaintiff had all the information Plaintiff needed to know its claims were completely meritless. It was Defendant that provided the final information needed to Plaintiff. Based on Defendant's counsel's account, Defendant did not need any other information from Plaintiff:

**MR. SCHUMAN**: They don't really -- they don't -- They've never done a drunk driving case; they've never done a dog bite case; they've never done a personal injury case. I asked for this stuff in discovery. I didn't get it. *Mr. Abhyanker's testimony was pretty clear in the 30(b)(6) deposition.* The main thing they do -- it's not even through the LegalForce website. They do it through a different website called Trademarkia and a different trademark -- is they get people who want a trademark registered or a patent filed and they charge them flat fees, ranging from 300 to 15,000 dollars. That's their business model. That's what they do. *None of the people who were on that Excel spreadsheet were there for trademark or patent issues. Not one. So their damages, right out of the gate, are zero.*

(Dkt. No. 228 at 24.) Defendant was entitled to depose the same individual personally at this late date; indeed, when Defendant noticed the deposition, Special Master McElhinny compelled it. (Dkt. No. 192.) But that does not make Defendant's deposition reasonable. As Special Master McElhinny stated: "In my view, courteous and professional counsel, recognizing that another deposition was in the offing [for the same person], would have scheduled matters to avoid unnecessary burden." (*Id.* at 3.) Defendant's counsel also added insult to injury. (Dkt. No. 333 at 253.) After a back-and-forth about the parties' disputes during the February 24 deposition, Judge Alsup concluded:

**THE COURT**: Because this is not -- this is the kind of stuff that gives lawyers and the legal profession a terrible image. You, *Mr. Abhyanker, and Mr. Schuman*. You should never engage in this kind of conduct and allow our profession to become smeared by this kind of conduct.

(Dkt. No. 334 at 452 (emphasis added).) So, no fees for this deposition are warranted.

Fifth, and relatedly, Defendant argues Plaintiff's discovery misconduct began far earlier, making Defendant's responses. Specifically, Defendant argues Plaintiff's misconduct began after the initial case management conference in August when Plaintiff's chief executive officer failed to sit for a deposition ordered at that hearing, and such misconduct prolonged the revelation the case lacked merit because Plaintiff's chief executive officer did not sit for a deposition until February. (Dkt. No. 364-1 at 12.) Not so. As an initial matter, Defendant's counsel failed to appear at that initial case management conference, so Defendant's counsel did not personally know what transpired there. (Dkt. Nos. 40, 41, 42; Dkt. No. 106 at 1-2.) At that initial case management conference, Judge Alsup ordered Plaintiff "by the end of this week [to] send a letter that proposes a date for your CEO [Abhyanker] to be deposed within one week of today." (Dkt. No. 44 at 4-5.)

The record does not show Plaintiff did not do as ordered.  Further, Plaintiff's chief executive officer was deposed, as a designee, by October 4, 2024, after Plaintiff had proposed various earlier dates while also moving for a protective order to postpone the deposition, which was denied. (Dkt. No. 56; Dkt. No. 65 at 2; Dkt. No. 146 at 1-2; Dkt. No. 188 at 8.)  Inexplicably, Defendant's opening brief on its motion for fees never mentions this October 4 deposition.  Furthermore, Defendant shares the blame for the second deposition's delay, as Defendant did not notice it to occur until January 27.  And after Mr. Abhyanker did not appear, Defendant waited two weeks before moving to compel.  (Dkt. No. 192.)  Additionally, as explained above, this deposition may not have been needed.

Sixth, Defendant argues Plaintiff's requests for depositions from Defendant were excessive and Defendant endured them reasonably.  However, Special Master McElhinny twice found Defendant had provided inadequate Rule 30(b)(6) designees:

> My review of the deposition transcript shows that [Defendant's] Mr. Border badly failed to meet the standard.  To begin, his personal knowledge of the topic was quite limited.  Mr. Border disclaimed personal knowledge of large swaths of the subject matter.  He claimed to have no personal insight into marketing activities by others in the organization, including his own direct reports.  What is more, Mr. Border testified that he made no effort whatsoever to inform himself more broadly to prepare to testify. He met with no other corporate employees.  (Tr. 10:16-17.)  He reviewed no documents other than a single e-mail chain.  (Tr. 11:2–23.)  To cap it off, many of the responses he did give were evasive, demanding frequent definitions and then limiting his answers accordingly.
>
> In its defense, the Defendant does not offer any examples of steps Mr. Border took to prepare himself to testify.  It relies on Border's response when he was challenged as to his preparation.  But even there he carefully narrows the scope of the topic and describes himself as "sort of" prepared to testify.
>
> In my view, "sort of" does not cut it.  Due to lack of personal knowledge, inadequate preparation and evasiveness, *the deposition simply wasted the Plaintiff's time.*

(Dkt. No. 121 at 3-4 (emphasis added).)  Later, Defendant designated another witness:

> *We've seen this movie before. . . .* The similarities between the two depositions are striking.  Both witnesses testified that they spoke to no other employees and reviewed no documents in order to prepare. Both witnesses were evasive, feigning an inability to understand common English.  Both witnesses were unprepared.  But in important

> ways, I find the [latter] deposition *more troubling* . . . [:] [D]efendant designated a member of its legal team to testify on subjects far afield from his normal responsibilities in *an apparent attempt to shield knowledgeable employees*.

(Dkt. No. 156 at 2.) Given this context, Defendant does not persuasively explain how Plaintiff's noticing and taking of numerous deponents was so exceptional as to warrant fees.

That said, fees for a final deposition fail for a different reason. Yes, Plaintiff purportedly noticed two depositions but took only one on February 20, 2025. (Dkt. No. 364-1 at 15 n.57 (citing Dkt. No. 364-2 ¶ 15.) That was after Plaintiff knew its case was meritless. But Defendant's statement explaining this deposition occurred cites only a sworn declaration it was *noticed*. (*Id.*) Moreover, for both Ms. Gilberti and Mr. Schuman, the attached billing records for that date combine many tasks, some ineligible. (Dkt. No. 364-2 at 82 (totaling 8.5 hours for emails, research, document review, and deposition); Dkt. No. 364-3 at 30 (totaling 6.8 hours for emails, phone calls, and deposition prep).)

Seventh, Defendant asserts Plaintiff had inflated damages estimates to $15 million even though Plaintiff had all the information it needed to determine there were no damages. Defendant also asserts discovery requests and responses were proportional to these damages estimates. But Defendant does not explain why it reasonably believed Plaintiff's estimates, or why Defendant did not attempt to estimate the damages itself before calibrating its response. Defendant had the information it needed to calculate damages even before Plaintiff did. At least by October 4, 2024, Defendant knew Plaintiff focused on trademark law, not dog bites; so, there could be no overlap of such referrals. Defendant did not need the productions about Defendant's referral rates—which Defendant failed to timely produce—to know Plaintiff did not have any damages. Defendant also controlled any evidence of its indirect profits. And yet, Defendant never moved for summary judgment.

The other attorney's fees or non-taxable costs Defendant lists fail for analogous reasons. For example, Defendant seeks costs for its late-February deposition of Mr. Abhyanker and for expert fees accrued at trial. (Dkt. No. 364 at 22–24.) Those fail for the same reason the related attorney's fees failed.

In sum, only a tiny fraction of Defendant's total fees incurred were caused by,

proportionate to, or reasonable given Plaintiff's exceptional case after February 15, 2025.

Regarding its reason to go to trial, Defendant argues:

> All fees after September 11, 2025, are a direct result of Plaintiff's desire to avoid paying costs and fees to Defendant. At that time, the Bill of Costs was $23,522.76 and the Application for Attorneys' Fees was $778,752.75, non-taxable costs were $4,515.09, and Expert Fees were $55,000. Because Mr. Abhyanker didn't want to pay $23,522.76 in billable costs, Defendant incurred another $1,824.42 in billable costs, $520,026 in attorneys' fees and $28,179.19 in expert fees.

(Dkt. No. 364-1 at 16.) But the inverse is also true. Because Defendant would not pay a $23,522 bill to end the action with certainty, or the cost to file a summary judgment motion, Defendant decided to incur around $550,000 in charges with the hopes of eventually ending the litigation. Assuming Defendant sought to limit costs, its approach makes no sense. Alternatively, assuming Defendant sought to vindicate its rights, its approach also made no sense; the proposed dismissal or a summary judgment motion would have sufficed.

Therefore, Defendant only reasonably incurred $74,950 in fees.

### B.      District Court Discretion

Even when the case is exceptional and the fees reasonable, the Lanham Act "permits" an award but "does not mandate" one. *See Nutrition Distrib.*, 978 F.3d at 1081. In exercising such discretion, district courts may consider factors including the intensity of the objective demerits and subjective misconduct, as well as "the need in particular circumstances to advance considerations of compensation and deterrence." *See Octane Fitness*, 572 U.S. 545, 554 n.6 (quoting favorably "'nonexclusive list of 'factors'" used "under a similar provision in the Copyright Act" in *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 534 n.19 (1994)). Here, even if the statute permitted a greater fee award than $74,950, awarding more would not accord with sound discretion.

Special Master Harold J. McElhinny summarized the rationale for his appointment and its result this way:

> This [wa]s a routine trademark infringement action filed in Federal Court because of the nature of the legal issues, not because of the size of the damages sought. To date, no novel legal issue has arisen. Unfortunately, the case has required a significant amount of judicial oversight because of the toxic relationship among counsel, a repeated lack of professionalism and courtesy on the part of both parties, and

United States District Court
Northern District of California

> a repeated failure to understand or to follow the local rules that apply to the case.
>
> Relying on his many years of experience, the District Judge foresaw from the earliest filings the problems that were likely to arise. Recognizing that it would be unfair to saddle a busy District or Magistrate Judge with the effort of overseeing these dystopian personality issues, the Judge directed the parties to the undersigned.
>
> Despite my best efforts and constant encouragement, the case has unfolded as the Judge foresaw. Getting the parties to meet and confer has been a monumental task. Over a quarter of my decisions have had to resolve complaints that one party or the other has failed to meet and confer. Counsel repeatedly accuse each other of lying. Counsel hang up on each other in the middle of calls. Counsel repeatedly copy me on performative emails, despite my repeated assurances that doing so cannot influence the outcome of my decisions.

(Dkt. No. 139 at 2 (cleaned up).)  Special Master McElhinny issued over 40 orders—more than two per month.  (Dkt. Nos. 65, 66, 74, 87, 88, 89, 100, 101, 113, 114, 119, 121, 122, 124, 128, 132, 133, 137, 138, 139, 142, 145, 146, 147, 148, 151, 152, 156, 157, 158, 159, 168, 170, 171, 178, 179, 184, 185, 190, 191, 192.)  He sanctioned both sides' counsel and shifted costs in both directions.  (Dkt. No. 101 at 3 (warning Plaintiff's counsel); Dkt. No. 121 at 4 (awarding costs to Plaintiff); Dkt. No. 139 at 4-5 (sanctioning Plaintiff's counsel); Dkt. No. 157 (sanctioning Defendant's counsel); Dkt. No. 185 at 3 (awarding costs to Defendant); Dkt. No. 192 (awarding costs to Defendant).)  And, in one of his last rulings, Special Master McElhinny underscored: "both of the parties in this case seem to be surprised by the unexpected effects of their strategic 'victories,'" and neither appreciates how a given "'victory' threatens to be a strategic loss."  (Dkt. No. 191 at 2.)

* * *

Defendant also asks the Court to award fees personally against Mr. Abhyanker, pursuant to Section 1927, rather than against Plaintiff, pursuant to the ordinary approach under the Lanham Act.  Defendant argues "Mr. Abhyanker is the sole owner of the Plaintiff law firm, and it cost him nothing to inflict maximum financial damage."  (Dkt. No. 378 at 15.)  But although Defendant contends Mr. Abhyanker did all the bad acts, Mr. Abhyanker has previously contended he sometimes acted as the client's officer, sometimes as its counsel, and sometimes in an elusive personal capacity apart from these others.  Defendant does not explain which of Mr. Abhyanker's

roles is to be blamed for what conduct. Defendant also does not explain why it is so important Mr. Abhyanker personally, rather than Plaintiff be blamed. And furthermore, Defendant does not explain why he cannot recover from Plaintiff. If Plaintiff, a law firm, once held liable, seeks to bring a claim personally against its counsel, one of its lawyers and its sole owner, it can do so. And, if Defendant cannot collect, it can seek to pierce the veil to do so.

All fees and costs which failed under the Lanham Act fail for the same reasons under Section 1927 and the district court's inherent authority. *See BillFloat Inc.*, 105 F.4th at 1278 n.5.

\* \* \*

For the reasons and to the extent explained above, Defendant's motion for fees is GRANTED IN PART and DENIED IN PART. In so holding, the Court is mindful of Judge Alsup's comment about the anticipated a fee motion:

> The undersigned [J]udge [Alsup] will take inactive status in a few days but expects that defense will bring a motion to label this case as *exceptional* so as to justify an award of attorney's fees. For the benefit of the successor judge and counsel, the undersigned adds the following:

> This case was on the weak side from the get-go but not necessarily implausible. The orange color on both sides gave it a tad of plausibility. But when defendant changed the color to crimson, that should have been the end of the case as to future injury.

> Both sides, however, refused to give up. Plaintiff, in its best light, was trying to prove that the original orange logo had diverted some potential clients to defendant's network of lawyers. By the time defendant finally produced records showing precious few trademark referrals (and none during the period of purported infringement), millions had been spent by both sides. In the Court's view, defendant dragged its feet in producing this evidence of infrequent referrals.

> By the time of trial, the only issue they were really fighting over was attorney's fees, for the orange-to-crimson color change had essentially eliminated any ongoing damages.

> This judge does not bless plaintiff's conduct herein, but in deciding whether the case is exceptional, the successor judge will please take into account the conduct of the defense, conduct that accumulated fees all out of proportion to the issues at stake. If there is doubt on this, please read the orders of Special Master for Discovery Harold McElhinny, as has the district judge (Dkt. Nos. 65, 66, 74, 87, 88, 89, 100, 101, 113, 114, 119, 121, 122, 124, 128, 132, 133, 137, 138, 139, 142, 145, 146, 147, 148, 151, 152, 156, 157, 158, 159, 168, 170, 171, 178, 179, 184, 185, 190, 191, 192).

United States District Court
Northern District of California

31

> At most, a small award in defendant's favor might be in bounds, but so would a ruling awarding zero on the principle that he who seeks equity must do equity.

(Dkt. No. 359 at 17 (cleaned up).)

## II.   PLAINTIFF'S MOTION TO RETAX COSTS

"Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—*should* be allowed to the prevailing party."  Fed. R. Civ. P. 54(d)(1) (emphases added).  But not all expenditures are "costs" subject to possible award.  *See* 28 U.S.C. § 1920.  And not all costs subject to award must be awarded if doing so would be inequitable in a particular case.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 926 (9th Cir. 2015) (citing *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 442 (1987)).

Defendant submitted a bill of costs seeking $25,347.18.  (Dkt. No. 352.)  The clerk disallowed about half and taxed $14,064.83.  (Dkt. No. 370.)  Plaintiff now moves to retax costs, contending some expenditures cannot be awarded and others should not be given the equities; specifically, Plaintiff seeks to be taxed between $0.00 and $8,029.62.  (Dkt. No. 372.)  However, in so arguing, Plaintiff seems to propose awarding certain costs the clerk had said should be disallowed.  And Defendant argues even some disallowed costs should have been allowed.  (Dkt. No. 379.)

A clerk's award is reviewed de novo.  The parties' proposals and the Court's orders are as follows:

| Categories of Costs at Issue | Def.'s Proposed Bill of Costs (Dkt. No. 352) | Clerk's Taxed Costs (Dkt. No. 370) | Pl.'s Proposed Re-Taxed Costs (Dkt. No. 372.) | ORDERED |
|---|---|---|---|---|
| **Special Master Fees** Civ. L.R. 54-3(f) | $9,375.00 | $9,375.00 | $0.00 | **$9,375.00** |
| **Deposition** transcript/video Civ. L.R. 54-3(c)(1) | $9,805.80 | $4,689.83 | $8,029.62 *at most, across all other categories* | **$3,950.40** |
| **Deposition** exhibits Civ. L.R. 54-3(c)(3) | $397.15 | $0.00 | | **$397.15** |
| **Deposition** notary & reporter fees | $3,979.50 | $0.00 | | **$3,947.50** |

32

| Civ. L.R. 54-3(c)(4),(5) | | | | |
|---|---|---|---|---|
| **Disclosure**/formal discovery documents Civ. L.R. 54-3(d)(2) | $619.81 | $0.00 | | **$0.00** |
| **Trial exhibits** Civ. L.R. 54-3(d)(4) | $1,169.92 | $0.00 | | **$0.00** |
| **TOTAL** | $ 25,347.18 | $ 14,064.83 | $8,029.62 | **$17,670.05** |

This order sets out only the reasons for the costs denied, with the remainder presumptively awarded. *See Save Our Valley v. Sound Transit*, 335 F.3d 932, 945 (9th Cir. 2003).

As to depositions, Defendant seeks reimbursement for all depositions taken. But, for the same reasons the Court denied attorney's fees for Mr. Abhyanker's February 24, 2025 deposition, the Court denies the request to shift costs. The requests to shift costs for video services ($2,257.50), video copy ($80.00), reporter ($32.00), and exhibits ($619.81), (Dkt. No. 379 at 18-19 ¶¶ 5, 14), are DENIED.[4]

As to deposition transcripts, Defendant argues "if the transcripts were not used at trial, the cost thereof is allowable if the transcripts are necessary for appeal, even if incurred prior to the filing of appeal." (Dkt. No. 379 at 3-4.) So, Defendant contends it needed five specific transcripts to prepare for trial. But Defendant only specifically swears to expenses for two of these—Katie Van de Bos's ($664.20) and Mr. Abhyanker's Rule 30(b)(6) ($3,286.20) deposition—not counting the one just barred above and also involving Mr. Abhyanker. (Dkt. No. 379 at 18-19 ¶¶ 8, 13.) Defendant has not brought specific records of other depositions to the Court's attention or explained how any other transcript could be relevant to preparing a response to Plaintiff's appeal.

As to trial exhibits, Defendant has had two opportunities to show it spent such sums preparing exhibits for trial. Defendant has again submitted a lengthy credit-card statement which describes costs as, for example, "FEDEX OFFIC19300011932 SAN FRANCISCO CA." (Dkt. No. 379 at 61.) Defendant's counsel's accompanying declaration also fails to swear to any details. (*Id.* at 19 ¶ 15.) Furthermore, a review of the exhibits introduced at trial does not reasonably explain how $1,169.92 could have been spent, even assuming some exhibits were prepared but

---

[4] The Court notes the last of these costs appears to have been tallied in the wrong category in Defendant's proposed bill of costs.

unused.  (Dkt. No. 362.)

The Court therefore GRANTS IN PART and DENIES IN PART Plaintiff's motion to retax costs.

## CONCLUSION

For the reasons stated above, Defendant's motion for fees is DENIED IN PART and GRANTED IN PART.  Plaintiff must pay Defendant $74,950 for its reasonable attorney's fees incurred.

In addition, Plaintiff's motion to retax costs is DENIED IN PART and GRANTED IN PART.  Plaintiff must pay Defendant $17,670.05 for costs incurred.  The Court also DENIES Plaintiff's motion to stay execution pending appeal.

Both sides are cautioned to reflect before making any further filing.

This Order disposes of Docket Nos. 364 and 372.

**IT IS SO ORDERED.**

Dated: May 13, 2026

_____
JACQUELINE SCOTT CORLEY
United States District Judge

34